Opinion
 

 CROSBY, J.
 

 Good fences not only make good neighbors, but good politicians too. So reasons the Political Reform Act of 1974 (PRA), Government Code section 81000 et seq., an initiative measure that erects barriers to public decisionmaking by officials who might otherwise govern in a financially self-interested manner. To implement these goals, the PRA calls for public disclosure and disqualification in appropriate circumstances.
 

 This appeal involves politicians whose conflicts of interest arose because they were neighbors. Because two of five council members had property or financial interests immediately adjacent to a massive redevelopment project, a city council acting as a redevelopment agency invoked the so-called “rule of necessity” in Government Code section 87101 to allow one of them to participate in a condemnation decision requiring four affirmative votes. The trial court issued an injunction to invalidate the government decision, holding the agency fatally erred in its rationale and methodology.
 

 We affirm the injunction on the latter ground. Public disclosure is a critical weapon in the fight against government corruption. Whether there is a real impropriety or merely the appearance of an impropriety, the public has a right to know the particulars. Having invoked the rule of necessity, the agency was duty-bound to explain why. As we stated in another context in
 
 Register Div. of Freedom Newspapers, Inc.
 
 v.
 
 County of Orange
 
 (1984) 158 Cal.App.3d 893, 907 [205 Cal.Rptr. 92], “ ‘The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.’ ”
 

 
 *516
 
 I
 

 The Brea Redevelopment Agency (Agency) embarked upon an ambitious 50-acre project to revitalize the historical downtown core in the City of Brea with a variety of commercial, retail, entertainment, office and residential uses. The project required the Agency to assemble a large amount of property, including commercial and residential sites.
 

 Respondent Michael George Kunec, a 77-year-old semiretired inventor, owned one of the parcels the Agency wanted to acquire. The 7,500-square-foot site was improved with a 3,200-square-foot industrial metal factory that was nearly the same age as its owner.
 

 The Agency wanted the property for three reasons. First, it was blighted. Second, it was needed to widen Brea Boulevard. Third, the Agency hoped to relocate the International Church of the Foursquare Gospel onto the site. The church, which was a “strong member of the City’s ministerial community,” previously had lost its home to redevelopment.
 

 The Agency was governed by the five elected council members of the City of Brea. On November 19,1991, after unsuccessfully attempting to negotiate with Kunec, the Agency held a hearing to consider adoption of a resolution of necessity to acquire the property by eminent domain. All five council members attended the meeting.
 

 The city attorney advised the Agency that two council members, Carrey Nelson and Ronald Isles, had conflicts of interest necessitating their abstention from voting on the resolution of necessity because each had “property interests within the 300 foot radius” of the redevelopment area. The Agency applied the rule of necessity to gain four voting members necessary to adopt the resolution of necessity. The city clerk tossed a coin, leading to the determination that Nelson would vote and Isles would abstain. By a four-to-zero vote, the Agency adopted the resolution to authorize the condemnation of Kunec’s property.
 

 On November 27, 1991, the Agency filed a complaint in eminent domain against Kunec. After the Agency deposited $200,000 as estimated compensation, the trial court issued an order for prejudgment possession. The Agency demolished the structures and placed Kunec’s personal property in storage.
 

 In December 1992, Kunec filed a cross-complaint to enjoin the action and declare invalid the resolution of necessity based on the Agency’s alleged
 
 *517
 
 PRA violations. The Agency demurred on the ground of lack of standing because Kunec was a resident of Anaheim, not Brea. In April 1993, Kunec filed a first amended cross-complaint, alleging he had acquired residency in Brea.
 

 Trial extended over four days in July 1993 and one day in October 1993. The trial court issued a lengthy and thoughtful statement of decision in June 1994. Trial was reopened in August 1994 to allow further testimony on Kunec’s alleged residency in Brea.
 

 The superior court issued an injunction and order of conditional dismissal in January 1995. The judge declared the resolution of necessity void and ordered the Agency to conduct a “fair, legal and impartial hearing” within 60 days of the order or the action would be dismissed. The Agency filed a timely notice of appeal from the injunction and order of conditional dismissal and a subsequent award of $100,432 in costs and attorney fees to Kunec.
 

 II
 

 The Agency stumbles at the threshold in challenging Kunec’s standing to bring this action. The Agency argues Kunec lacks standing to question the fairness or impartiality of its passage of the resolution of necessity because he did not reside in Brea, but only owned property there. For good measure the Agency also insists that Kunec had to have been a resident when the resolution of necessity was adopted.
 

 We reject both arguments. The trial court had substantial evidence to support Kunec’s standing. Indeed we question whether Kunec had to establish residency at all to challenge the validity of a governmental action taken directly against his property.
 

 The PRA extends standing to bring a private civil action for injunctive relief to “[a]ny person residing in the jurisdiction . . . .” (Gov. Code, § 91003, subd. (a).) It does so based upon declared findings that “[pjrevious laws regulating political practices have suffered from inadequate enforcement by state and local authorities.” (Gov. Code, § 81001, subd. (h).) The PRA is liberally construed to accomplish its purposes. (Gov. Code, § 81003.)
 

 First, substantial evidence supports the trial court’s determination that Kunec resided in Brea during the pendency of the action. The trial court conducted two separate hearings and heard testimony from three different
 
 *518
 
 witnesses, including Kunec and his landlord. Kunec, an elderly, unmarried man who was blind and in poor health, testified he lived in a rented room in a single-family residence in Brea. He registered to vote and voted there. He did not drive and relied upon his landlord to take him to the hospital, pick up groceries, and go on errands. He often ate with the landlord’s family. While he used his house in Anaheim for storage and research, he denied he planned to return there to live because “[t]he neighborhood has [gone] down. We have drug dealers and thieves living in the same street.” He had no water, restroom facilities or beds at the Anaheim house, and terminated his homeowner’s exemption there.
 
 [1]
 

 The trial court heard Kunec’s testimony and believed him. While the Agency has reason to question his credibility, given his contrary statements in his deposition testimony, that is a matter for the trial court, not us. We may not discount Kunec’s testimony “unless it is physically impossible or inherently improbable and such inherent improbability plainly appears.”
 
 (Beck Development Co.
 
 v.
 
 Southern Pacific Transportation Co.
 
 (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518].) Since there was substantial evidence to support the trial court’s conclusions, we will not second-guess them.
 

 Second, we reject the Agency’s efforts to rewrite the PRA to insert a durational residency requirement into Government Code section 91003. In construing legislation “. . . the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted.” (Code Civ. Proc., § 1858.) Section 91003 contains no specific time reference for the residency provision, and we will not add one. (Cf.
 
 Ector
 
 v.
 
 City of Torrance
 
 (1973) 10 Cal.3d 129, 135-136 [109 Cal.Rptr. 849, 514 P.2d 433] [“There is no similar ‘waiting period’ in the provision before us, but simply a requirement of residence in the community in order to be a municipal employee”].)
 

 Our interpretation of the PRA does not render the residency requirement “utterly meaningless” nor does it encourage “political bounty hunters” to “move about from jurisdiction to jurisdiction, filing lawsuit after lawsuit, attempting to extract money from public officials.” As the Agency itself points out, Kunec can only be a resident of one jurisdiction. Having physically relocated from Anaheim to Brea, Kunec was precluded from voting in Anaheim elections or from bringing PRA lawsuits within that city as a resident. That is a fairly significant price to pay.
 

 
 *519
 
 Indeed we doubt whether the PRA actually requires condemnees to be residents of the jurisdiction where the affected property is located to challenge the validity of the governmental decision. The PRA on its face is intended to
 
 extend
 
 standing, not limit it. Its legislative findings expressly speak of the need to afford private citizens as well as public officials such “[ajdequate enforcement mechanisms” to ensure “this title will be vigorously enforced.” (Gov. Code, § 81002, subd. (f).) It is absurd to allow the 35,122 residents in Brea standing to challenge the Agency’s decision, but not the person with the greatest beneficial interest.
 

 Under the common law, “. . . those who are adversely affected by the operation of an ordinance may question its validity.” (56 Am.Jur.2d, Municipal Corporations, etc., § 379 at p. 417.) For example, in
 
 Clark
 
 v.
 
 City of Hermosa Beach
 
 (1996) 48 Cal.App.4th 1152, 1170 [56 Cal.Rptr.2d 223], a husband and wife whose primary residence was in Phoenix, but who owned a duplex in Hermosa Beach, challenged the validity of a city decision affecting their beach property. The council member who cast the deciding vote lived a block away and admittedly would lose some of his ocean views. Speaking of the plaintiffs’ right to a fair hearing by impartial officials, the
 
 Clark
 
 court stated, “ ‘[T]he common law doctrine against conflicts of interest . . . prohibits public officials from placing themselves in a position where their private, personal interests may conflict with their official duties.’ ”
 
 (Id.
 
 at p. 1171.)
 

 And in
 
 San Bernardino County Flood Control Dist.
 
 v.
 
 Grabowski
 
 (1988) 205 Cal.App.3d 885 [252 Cal.Rptr. 676], a condemnee contended that one of the votes cast in favor of the resolution of necessity was invalid under the conflict-of-interest provisions of the PRA. The Court of Appeal recognized that statutory language in Code of Civil Procedure section 1250.360, subdivision (h) might “superficially” permit a challenge under the eminent domain law. Relying upon the legislative comments, it declined to do so
 
 solely
 
 because it concluded the condemnee could directly raise the
 
 same
 
 attack under the PRA. (205 Cal.App.3d at p. 895.)
 

 It was the Agency, not Kunec, that initiated the instant eminent domain proceeding. It would be Kafkaesque to say that the person most directly affected—the condemnee whose property would be taken—lacks standing to claim the action against him is void because of PRA violations.
 

 Ill
 

 The Agency was faced with a real dilemma once the city attorney advised of the conflicted interests of council members Nelson and Isles. The eminent domain law requires any resolution of necessity to be approved by a two-thirds majority of
 
 all
 
 the members of the governing body, or four
 
 *520
 
 votes in a five-member body.
 
 (San Bernardino County Flood Control Dist.
 
 v.
 
 Grabowski, supra, 205
 
 Cal.App.3d 885, 893, citing Code Civ. Proc., § 1245.240.)
 

 Without the participation of one of the conflicted members, the Agency’s only possible action would be to reject the resolution of necessity since the number of unconflicted members was insufficient to sustain an affirmative vote. Despite the presence of a quorum of three unconflicted council members, their votes were not sufficient to make a
 
 decision
 
 (to defeat or pass) on the resolution of necessity. As the Agency aptly points out, “voting on the Resolution under such circumstances would have been an empty formality to arrive at a pre-ordained result.” The Agency sought to avoid any outcome-determinative resolution by choosing the requisite fourth vote by lot. (See discussion in 61 Ops.Cal.Atty.Gen. 243, 255 (1978), citing 4 FPPC Opns. 13, 17-18 (No. 77-007, Feb. 8, 1978).)
 

 The common law developed the rule of necessity to prevent the vital processes of government from being halted or impeded by officials who have conflicts of interest in the matters before them.
 
 (Gonsalves
 
 v.
 
 City of Dairy Valley
 
 (1968) 265 Cal.App.2d 400, 404 [71 Cal.Rptr. 255] [applying rule of necessity to situation where all public officials had financial stake in decision].) There is a strong public policy “that members of public legislative bodies take a position, and vote, on issues brought before them. This policy has been expressed as ‘the duty of members of a city council to vote and that they ought not “by inaction, prevent action by the board.” ’ ”
 
 (Dry Creek Valley Assn., Inc.
 
 v.
 
 Board of Supervisors
 
 (1977) 67 Cal.App.3d 839, 844 [135 Cal.Rptr. 726].)
 

 The PRA recognizes the tension between two competing policies of the law: the need for unbiased decisionmaking on the one hand (Gov. Code, § 87100)
 
 and
 
 the need for public action on the other (Gov. Code, § 87101). As a statutory analogue to the common law rule of necessity, section 87101 allows conflicted government officials to participate in decisions where their participation is “legally required for the action or decision to be made.” This happens when “there exists no alternative source of decision . . . .” (Cal. Code Regs., tit. 2, § 18701, subd. (a).)
 
 [2]
 

 In
 
 Affordable Housing Alliance
 
 v.
 
 Feinstein
 
 (1986) 179 Cal.App.3d 484, 489 [224 Cal.Rptr. 557], the court applied Government Code section 87101
 
 *521
 
 to permit then Mayor Dianne Feinstein to veto a rent control ordinance even though she owned apartment units within the city. The court rejected the argument that Feinstein’s participation was not “legally required” for the decision to be made because the city charter allowed the ordinance to become law automatically without her signature. It stated, “The flaw in plaintiffs’ argument is apparent. . . . Under plaintiffs’ reasoning, a San Francisco mayor would be compelled to approve every ordinance in which he or she had a financial interest within the meaning of the Act. Surely plaintiffs cannot seriously be arguing for that one-sided result.” (179 Cal.App.3d at p. 490.) The court refused to lock public entities or officials into a predestined result without any available alternatives.
 

 We similarly doubt the voters who enacted the PRA by initiative intended thereby to automatically disapprove any ordinance requiring a supermajority in the event of a conflict of interest. This effectively would eliminate a governing board’s role in the decisionmaking process. Increasingly, the old adage of “majority rules” has been replaced by a new one: “supermajority rules.” A level playing field requires the participation of the requisite number of players. Without the rule of necessity, the PRA would do more than wall off the decisionmaker; it also would wall out the decision.
 
 [3]
 

 Participatory democracy can be destroyed as much by obstructive inaction as by biased action. The sword that cannot be unsheathed often inflicts the deepest cuts of all.
 

 IV
 

 While the Agency had good reason to assert Government Code section 87101 to avoid government by paralysis, it did not properly invoke it. The Agency fatally erred in failing to make a full public disclosure on the record (namely the minutes of the proceeding) about why council members Nelson and Isles were actually or potentially conflicted, and without explaining on the same public record why there was no alternative to the city council as a source of decisionmaking authority. This is required under the regulations of
 
 *522
 
 the Fair Political Practices Commission (FPPC) interpreting section 87101. (Cal. Code Regs., tit. 2, § 18701, subd. (b).)
 
 [4]
 

 Although the minutes describe in great detail the Agency’s decision to invoke the rule of necessity, they do not explain the nature of Nelson’s or Isles’s financial interests other than to state that Nelson owned property “within 300 feet of the perimeter of the project” and that Isles “has business interests with Mr. McBride, who holds property interests in the area.” The minutes also do not explain why the council was the only collective body able to reach the decision.
 
 [5]
 

 The Agency reasons the minutes are not a reporter’s transcript and do not reflect all the oral statements that might (or might not) have been made. That is precisely the point. Such conflicts should be disclosed in the minutes to make them easily accessible to the public at large. (See, e.g.,
 
 People
 
 v.
 
 Stephen
 
 (1986) 182 Cal.App.3d Supp. 14, 22 [227 Cal.Rptr. 380] [“The rationale behind requiring the reasons to be set forth in the minutes as
 

 
 *523
 
 contrasted with allowing them to be . . . transcribed from a reporter’s notes is to ensure that the reasons are readily ascertainable and available to the public and the reviewing court”];
 
 People
 
 v.
 
 Deere
 
 (1991) 53 Cal.3d 705, 721 [280 Cal.Rptr. 424, 808 P.2d 1181] [whether anything took place off the record “is purely a matter of speculation”].) The trial court acted consistently in relying on the minutes to show a conflict justifying the rule of necessity and the Agency’s failure to fully disclose the nature of that conflict. Since the Agency thereby lacked the necessary fourth vote, Kunec has met his burden of showing that “the official action might not otherwise have been taken or approved” but for the violation of the PRA. (Gov. Code, § 91003, subd. (b).)
 

 The Agency has not questioned either at trial or on appeal the trial court’s determination that it failed to adequately disclose “on the record, the nature of [Nelson’s and Isles’s] financial involvement and the interest that is the basis of [the] conflict.” We therefore do not determine the manner or method in which a public agency must explain “on the record” the nature of any conflict of interest giving rise to the rule of necessity.
 
 [6]
 

 The Agency contends the rule of necessity was invoked because of a “possible” conflict, rather than an actual one, and therefore no further disclosure need be made. But even here the public has a right to know the nature of that potential conflict. Ironically, it would create even more of an “appearance of impropriety” for a “possibly” conflicted member to vote on a measure without publicly explaining why. As the trial court commented, “If [public officials] err on the side of caution once they invoke [the rule of necessity] I think they have to do it fully. If they want to invoke it then they ought to get up and make the statement required in [FPPC regulation] 18701 and instead of enumerating the conflict, enumerate the circumstances that might give rise to a conflict ... so that the public knows what they’re talking about. . . .”
 

 V
 

 As a fallback position the Agency attempts to impeach its own invocation of the rule of necessity by arguing that neither Nelson nor Isles actually had disqualifying conflicts of interest. It contends the minutes
 
 *524
 
 contain multiple layers of hearsay and cannot be relied upon to mean what they say. It claims Kunec did not otherwise meet his burden of proof at trial of establishing that Nelson had a conflict under Government Code section 87103 and title 2 of the California Code of Regulations, section 18702.3.
 

 We agree with the trial court that the minutes establish a prima facie case of a conflict. The minutes were transcribed by the city clerk who has a duty to “keep a correct record of its proceedings.” (Gov. Code, § 36814.) They were subsequently reviewed and approved at another council meeting on December 17, 1991, when all the council members, including Nelson and Isles, had an opportunity to correct any misstatements and rectify any omissions. The Agency stipulated to the foundation for admission of the minutes. As the court cogently asked, “What is the import of the minutes ... if [they] can’t be relied on for anything?”
 

 Along with the trial court, we place determinative weight upon the operative fact, as shown in the minutes, that the
 
 Agency
 
 applied the rule of necessity to allow Nelson to vote. The minutes state, “The vote tonight has been preceded by a process that legally invests Agency Member Nelson with the power to participate, recognizing the conflict of interest provisions in which he would normally have to deal.” This is not hearsay but is “original evidence. . . . [W]ritten or oral utterances, which are acts in themselves constituting legal results in issue in the case, do not come under the hearsay rule.”
 
 (Zuckerman
 
 v.
 
 Pacific Savings Bank
 
 (1986) 187 Cal.App.3d 1394, 1404, fn. 2 [232 Cal.Rptr. 458]; see also 56 Am.Jur.2d, Municipal Corporations, etc., § 178, p. 229, fns. omitted [“Records of a municipal council are not only properly admissible in evidence to prove the facts stated therein, but they are the best evidence of such facts, and it is well settled that evidence will not be admitted, in a collateral action, to vary or contradict such record when regular and complete on its face”].)
 
 [7]
 

 The Agency may not invoke Government Code section 87101 to overcome a conflict of interest and, at the same time, deny the very existence of
 
 *525
 
 such a conflict of interest. California public policy “will not permit a litigant ‘to blow hot and cold’ ” by taking the benefits of a doctrine “when it suits his purpose” and then repudiating the same facts “when it is no longer profitable or to his advantage to do so.”
 
 (In re Marriage of Toth
 
 (1974) 38 Cal.App.3d 205, 212 [113 Cal.Rptr. 131] [barring husband from repudiating divorce decree for lack of jurisdiction from which he benefited];
 
 Lovret
 
 v.
 
 Seyfarth
 
 (1972) 22 Cal.App.3d 841 [101 Cal.Rptr. 143] [estopping client from denying she was party to arbitration whose benefits she accepted].) Public confidence on so critical a matter as conflicts of interest requires the government to speak clearly and with one voice.
 

 The Agency presents a “classic case of closing the bam door after the horse is gone.”
 
 {In re Marriage of Fini
 
 (1994) 26 Cal.App.4th 1033, 1037, fn. 3 [31 Cal.Rptr.2d 749].) Having itself raised (and relied upon) the mle of necessity, the Agency cannot now retract its actions with the Emily Litellalike explanation, “Never
 
 [8]
 

 VI
 

 The trial court’s statement of decision does not support Kunec’s charge of a
 
 gross
 
 abuse of discretion in adopting the resolution to take his property. As the Agency points out, the trial court
 
 rejected
 
 Kunec’s claim the Agency was “irrevocably committed” to acquiring his property, thereby distinguishing this case from
 
 Redevelopment Agency
 
 v.
 
 Norm’s Slauson
 
 (1985) 173 Cal.App.3d 1121, 1127 [219 Cal.Rptr. 365]. The Agency’s dealings with the church were undertaken pursuant to its statutory responsibility to relocate tenants within a redevelopment area to the extent practicable and consistent with the overall redevelopment. (Health & Saf. Code,
 
 *526
 
 § 33339.5.) We do not construe the trial court’s discussion on the subject as sustaining a finding the hearing was a sham.
 

 On a separate matter, we decline to consider the Agency’s challenge to the timeliness of Kunec’s cross-complaint under the PRA. It claims it suffered irrevocable damage because it already had put Kunec’s property to public use under the trial court’s order for prejudgment possession. The Agency offers too little, too late.
 
 [9]
 

 VII
 

 The Agency’s challenge to the attorney fee award stands or falls upon the outcome of the other issues of this appeal. Other than to seek to undermine Kunec’s status as a “prevailing party” under Government Code section 91012, the Agency questions neither the amount of time nor whether the fees were reasonably incurred.
 

 Kunec is the “prevailing party” on a significant number of the issues involved in this appeal. He need not be the prevailing party on every issue. Since we affirm the injunction, based upon the Agency’s failure to comply with the disclosure requirements, we affirm the fee award as well.
 

 The matter is remanded to the trial court with directions to make any modifications to the injunction, if necessary, to conform to this opinion. Kunec is to have his costs on appeal.
 

 Sills, P. J., and Rylaarsdam, J., concurred.
 

 A petition for a rehearing was denied June 20, 1997, and appellant’s petition for review by the Supreme Court was denied August 20, 1997.
 

 [1]
 

 The Agency concedes it must “assum[e] all facts testified to by respondent are true. . . .” We do not understand how it then can ignore Kunec’s direct testimony that he intended to remain as a resident in Brea. Given Kunec’s testimony, the Agency’s references to people who move into a jurisdiction for a “temporary” or “special”purpose are beside the point.
 

 [2]
 

 Government Code section 87100 provides, “No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest.”
 

 Section 87101 states, “Section 87100 does not prevent any public official from making or participating in the making of a governmental decision to the extent his participation is legally required for the action or decision to be made. The fact that an official’s vote is needed to break a tie does not make his participation legally required for purposes of this section.”
 

 
 *521
 
 The implementing regulation provides, in pertinent part, “A public official is not legally required to make or to participate in the making of a governmental decision within the meaning of Government Code Section 87101 unless there exists no alternative source of decision consistent with the purposes and terms of the statute authorizing the decision." (Cal. Code Regs., tit. 2, § 18701, subd. (a).)
 

 [3]
 

 Significant limitations still remain on the application of the rule of necessity, which cannot be used to break a deadlock or to reach a particular result. Government Code section 87101 specifically provides that “[t]he fact that an official’s vote is needed to break a tie does not make his participation legally required for purposes of this section.” Neither does it appear to permit government officials to vote on contracts in which they may be financially interested. (See discussion in 61 Ops.Cal.Atty.Gen.,
 
 supra,
 
 243, 255, construing Gov. Code, § 1090;
 
 Thomson
 
 v.
 
 Call
 
 (1985) 38 Cal.3d 633 [214 Cal.Rptr. 139, 699 P.2d 316].)
 

 [4]
 

 The regulation obligates the conflicted public official to “(1) Disclose as a matter of official public record the existence of a financial interest; [QQ (2) Describe with particularity the nature of the financial interest before he or she makes or participates in making the decision; [QQ (3) State the reason there is no alternative source of decision-making authority; [ID (4) Participate in the decision only in an open meeting of the agency, as required by Government Code sections 11123 and 54953, or in closed session, as provided in Government Code sections 11126, 54956.7, 54956.8, 54956.9, 54957 and 54957.6, where participation by the official is legally required for the agency to act. . . .” (Cal. Code Regs., tit. 2, § 18701, subd. (b).)
 

 Neither party has challenged the FPPC’s authority to require a description “with particularity” of the interest, given that the statute (Gov. Code § 87101) makes no reference to disclosure
 
 at all.
 
 While administrative regulations cannot exceed the scope of the enabling statute (Gov. Code, § 11342.2), the “absence of any specific [statutory] provisions regarding the regulation of [an issue] does not mean that such a regulation exceeds statutory authority . . . .”
 
 {Credit Ins. Gen. Agents Assn.
 
 v.
 
 Payne
 
 (1976) 16 Cal.3d 651, 656 [128 Cal.Rptr. 881, 547 P.2d 993].) The regulation comes to us shielded by a presumption of regularity which the Agency has left uncontested.
 
 {Pacific Legal Foundation
 
 v.
 
 Unemployment Ins. Appeals Bd.
 
 (1981) 29 Cal.3d 101, 111 [172 Cal.Rptr. 194, 624 P.2d 244]; see also
 
 Bell
 
 v.
 
 Board of Supervisors
 
 (1994) 23 Cal.App.4th 1695, 1710 [28 Cal.Rptr.2d 919] [“ ‘A regulation, like a statute, is presumed valid and a challenger bears the burden of pleading and proof of invalidity’ ”].)
 

 [5]
 

 At oral argument Kunec cited Health and Safety Code section 33200, which permits a city council acting as a redevelopment agency to replace any member “who does not wish to serve on the agency” with an elector from the same jurisdiction. Kunec also mentioned Health and Safety Code sections 33201 and 33202, which allow a city council sitting as a redevelopment agency to delegate “any of its functions as the governing body of the agency” to an appointed seven-member redevelopment commission. Since neither the appointment of a replacement nor the delegation to a commission requires supermajority votes, these alternatives have the advantage of permitting a decision to be made by an alternative body which does not present a conflict of interest. In the absence of appellate briefing on the subject, we do not decide whéther an agency is
 
 required
 
 to pursue these alternatives in lieu of employing the rule of necessity, nor do we decide whether they are available on an ad hoc basis.
 

 [6]
 

 We specifically do not decide whether a public agency, in invoking the rule of necessity, may rely on the annual statements of economic interests which public officials file to disclose their investments, interests in real property, and income (see Gov. Code, §§ 87200, 87203, 87206, 87207) to satisfy the regulation’s twin requirements that the disclosure be contained in an “official public record” and that it describe “with particularity” the “nature of the financial interest” (see Cal. Code Regs., tit. 2, § 18701, subd. (b)(2).) Since the Agency never raised this issue at trial or on appeal, we need not resolve whether compliance with this regulatory requirement must be explicitly recorded in the minutes.
 

 [7]
 

 The minutes thus show the city attorney did more than give advice to Nelson and Isles about the presence or absence of a conflict of interest; instead, by its own words, the Agency itself engaged in a “process” to “legally invest” Nelson with the right to vote. We fail to see any connection with the decision in
 
 Thomson
 
 v.
 
 Call, supra,
 
 38 Cal.3d 633, which refused to allow an advice of counsel defense to a civil forfeiture action under Government Code section 1090.
 

 Since we reject the Agency’s efforts to contradict its own determination about the existence of a conflict, we need not decide whether the PRA actually required Nelson and Isles to disqualify themselves pursuant to the city attorney’s advice. Isles denied “for the record” that he owned any property within 300 feet of the property or that he had any financial interest in it. He did not explain his relationship with McBride. Unlike Isles, Nelson said nothing for the record about his lack of any conflict, nor did he add any explanation when the minutes were approved several weeks later. Despite Isles’s denial of any conflict he still abstained from participation and his absence was used to justify the application of the rule of necessity. As the trial court observed, if Isles was not conflicted, he should have voted, not Nelson; if Isles
 
 *525
 
 was conflicted, he should not even have participated in the discussion. Thus, the Agency’s action still would have been void under the PRA.
 

 [8]
 

 In its petition for rehearing the Agency argues Nelson should not “automatically and conclusively be deemed conflicted” simply because the Agency “inartfully” invoked the rule of necessity. We disagree with the Agency’s suggestion that the “uncontroverted” evidence established “the Brea Town Center Project would have no measurable impact on the value or rental rates of Nelson’s property.” The Agency relies on the expert testimony of appraiser Jeffrey Nagasaki, who was retained to ascertain the financial impact of the redevelopment project on 3 properties owned by Nelson located within 200 to 300 feet of the eminent domain area and 1,500 feet of Kunec’s property. Nagasaki analyzed residential property values before and after the completion of two redevelopment projects in the City of Baldwin Park. He found minimal price differences and concluded the same impact would occur in Brea. Under the substantial evidence standard, we must conclude the trial court disregarded Nagasaki’s testimony because of his failure to show socioeconomic conditions in Baldwin Park were similar to conditions in Brea.
 

 Rather than “assuming” the existence of a conflict, we sustain the trial court’s decision to rely on the Agency’s own minutes as prima facie evidence of a conflict. It is a fundamental rule of construction that a legislative body “knew what it was saying and meant what it said.”
 
 {Rideout Hospital Foundation, Inc.
 
 v.
 
 County of Yuba
 
 (1992) 8 Cal.App.4th 214, 221 [10 Cal.Rptr. 141].)
 

 [9]
 

 The subject was not raised among the Agency’s six issues on appeal, but appears in a footnote on the page 49 of the Agency’s 50-page brief. We give the matter the same footnoted shrift as did the Agency. A “passing reference” in a brief does not suffice to establish a legal argument.
 
 (1119 Delaware
 
 v.
 
 Continental Land Title Co.
 
 (1993) 16 Cal.App.4th 992, 1004 [20 Cal.Rptr.2d 438].) There is no rule requiring a party “to respond to his opponent’s every argument, subargument, and allegation, no matter how meritless or briefly made.”
 
 (People
 
 v.
 
 Hill
 
 (1992) 3 Cal.4th 959, 995, fn. 3 [13 Cal.Rptr.2d 475, 839 P.2d 984].) We do note, as Kunec pointed out during oral argument, that he raised the issue of the alleged PRA violation as early as February 1992, thereby putting the agency on notice several months
 
 before
 
 the order for prejudgment possession was to be effective.