Filed 9/16/14  Texas 1845 LLC v. Blue Pacific Aviation CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TEXAS 1845 LLC,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BLUE PACIFIC AVIATION, INC. et al.,<br><br>    Defendants and Appellants. | D064354<br><br><br>(Super. Ct. No. 37-2011-00096397-<br> CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, John S.

Meyer, Judge.  Affirmed.

Law Office of Gregory P. Olson and Gregory P. Olson; Law Office of Robert L.

Kenny and Robert L. Kenny, for Plaintiff and Respondent.

Law Offices of Matthew D. Rifat and Matthew D. Rifat for Defendants and

Appellants.

Defendants Blue Pacific Aviation, Inc. (Blue Pacific) and Dr. James Smith appeal

from a $6,065,141.91 judgment in favor of plaintiff Texas 1845 LLC (Texas) on its

breach of contract and breach of guaranty claims. We conclude defendants' appellate contentions are without merit and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Dr. Smith is a physician practicing in San Diego. In 2004, Dr. Smith formed Blue Pacific to purchase, own, and operate a jet aircraft. Dr. Smith is Blue Pacific's CEO and sole shareholder and director.

The next year, in 2005, Blue Pacific borrowed approximately $4.8 million from Key Equipment Finance, Inc. (Key) to finance the purchase of a jet aircraft. As part of this transaction, Blue Pacific executed a promissory note (Note) and granted Key a security interest in the aircraft in the event of a default (Security Agreement). In June 2005, Dr. Smith signed a personal guaranty (Personal Guaranty), guaranteeing the payment and performance of Blue Pacific's obligations under the Note and Security Agreement. The parties agreed New York law would govern the transactions.

The Note required Blue Pacific to make monthly payments of about $22,000 (and later approximately $27,000) for a specified time plus a final payment of $4.2 million. As amended in 2007, the Note provided for a 6.48 percent interest rate, and an 18 percent interest rate in the event of a default.

From 2005 through 2009, Dr. Smith used the aircraft for personal travel and for his airplane charter business. In October 2009, Blue Pacific stopped making the monthly payments on the Note. In January 2010, Key declared the entire unpaid loan balance ($4,727,029.68) due and payable. Dr. Smith (and/or his attorney) responded by seeking

2

additional time to pay the loan, and represented that Dr. Smith was making vigorous attempts to sell the aircraft.

Six months later, in June 2010, Key entered into a Forbearance and Modification Agreement (Forbearance Agreement) with Blue Pacific and Dr. Smith. In this agreement, Blue Pacific and Dr. Smith acknowledged they owed Key $5,089,647.03 (the loan balance plus interest and late charges). They also agreed they had defaulted on the Note and "forever waive[d] any and all offsets or defenses to the total indebtedness due to Key . . . ." In exchange, Key agreed it would forbear from exercising its rights and remedies under the Note and Security Agreement and would provide certain discounts and payment extensions *if* Blue Pacific and Dr. Smith satisfied certain conditions. These conditions included that Blue Pacific would sell the aircraft and deliver the proceeds of at least $2.1 million to Key by September 1, 2010, or, if no sale occurred, deliver the aircraft to Key by this date. Under either option, Blue Pacific/Smith would be required to pay the outstanding balance (at an agreed-upon discount and reduced interest rate) in monthly installments over five years beginning in October 2010.

The Forbearance Agreement also provided that until the aircraft was either sold or turned over to Key, Dr. Smith was required to keep the aircraft engines on a maintenance schedule, known as a Maintenance Service Plan, and Dr. Smith was not permitted to fly the aircraft except for required maintenance or a demonstration flight to sell the aircraft. These conditions were material to the Forbearance Agreement because they provided assurance that the value of the aircraft would be preserved.

The Forbearance Agreement stated that if Dr. Smith and Blue Pacific did not sell the aircraft and turn over the sales proceeds by the September 1 date (or timely return the aircraft), Key had the right to repossess the aircraft and the Forbearance Agreement's time extensions and discount provisions would become "null and void." Upon a default, the total indebtedness under the Note "shall be immediately due and payable to Key" and Key would have the right to enforce all rights and remedies under the Note, Security Agreement, and Personal Guaranty.

During the next six months, Dr. Smith breached numerous provisions of the Forbearance Agreement. He did not sell or turn over the aircraft by September 1, 2010. He instead continued to fly the aircraft on charter flights to various locations in the United States, Canada, and Mexico. He also failed to make any payments on the loan. Dr. Smith also violated his agreement to keep the aircraft engines on the maintenance plan, causing a substantial decline in the aircraft's value.

On December 29, 2010, Key assigned to Texas its rights to collect under the loan documents, including the Note and Personal Guaranty. As discussed in more detail below, the assignment was reflected in a document entitled the "OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS" (Omnibus Assignment).

On or about the same date, Key provided Texas with an allonge endorsement (Allonge) that was attached by a paper clip to the Note. The Allonge specifically identified the Note and stated it was payable to Texas. An "allonge" is an endorsement of a negotiable instrument contained on a separate piece of paper rather than the back of the instrument. (See *Pribus v. Bush* (1981) 118 Cal.App.3d 1003, 1007-1011.)

4

Texas and Key executed the Allonge *and* the Omnibus Assignment as part of a "belt and suspenders" plan, believing either would be sufficient to transfer the creditor rights but providing extra assurance that the transfer would be upheld.

The next month, Texas's managing partner communicated with Dr. Smith's attorney regarding the Note repayment, but they did not reach any agreements or resolutions. In late January 2011, Texas took possession of the aircraft. Before it could sell the aircraft, Texas was required to pay about $475,000 to reinstate the aircraft on the Maintenance Schedule Plan (a prerequisite to sell an aircraft in a commercially reasonable manner) and to pay $369,946.54 to refurbish the aircraft to ensure a fair sale price. Texas later sold the aircraft to a third party for about $2.2 million. After deducting the amounts to reinstate the Maintenance Schedule Plan, refurbish the aircraft, and pay broker commissions, Texas received $1,153,425.07.

Texas then filed this action against Dr. Smith and Blue Pacific to collect the remaining deficiency due on the Note and Personal Guaranty. The first cause of action was against Blue Pacific for breach of the Note, and the second cause of action was against Dr. Smith for breach of the Personal Guaranty. Smith and Blue Pacific cross-complained, alleging conversion and fraud.

The parties waived a jury. At trial, the evidence was undisputed that Blue Pacific executed the Note and Security Agreement; Blue Pacific was in default on the Note; and Dr. Smith had executed the Personal Guaranty, promising to pay amounts owed on the Note but had not done so. To show it had the right to enforce the Note and Personal Guaranty, Texas produced copies of the Allonge and the Omnibus Assignment. It argued

5

that either the Allonge or the Omnibus Assignment was sufficient to show it was the current holder of the Note and Personal Guaranty and it had the legal right to enforce these documents. Texas also produced evidence (summarized above) that defendants breached numerous provisions of the Forbearance Agreement and thus argued that the Forbearance Agreement no longer governed the parties' relationship. Texas also submitted a spreadsheet (Exhibit 50) setting forth the amounts owed by Dr. Smith and Blue Pacific under the Note and Personal Guaranty as of the May 2013 trial date.

Defendants' primary defense was that Texas had no standing to enforce the Note and Personal Guaranty because: (1) the Allonge did not satisfy Uniform Commercial Code (UCC) requirements because it was not sufficiently "affixed" to the Note; and (2) the Omnibus Assignment did not transfer rights to the Personal Guaranty. Defendants also argued Texas was barred from enforcing the Note because it did not provide defendants with benefits under the Forbearance Agreement, including additional time to pay off the debt and an amortization schedule. Defendants maintained that the Forbearance Agreement superseded the Note and Security Agreement. Defendants further claimed that Texas did not sufficiently prove the amounts owed on the Note.

In a detailed statement of decision, the court found Texas proved its claims and rejected defendants' defenses. In relevant part, the court stated:

> "The Court concludes that [Texas] has standing to enforce the Note and Guaranty. The Allonge endorsement states it was attached to the Note and satisfies the requirements of the Uniform Commercial Code. . . . Moreover, the Omnibus Assignment independently provides [Texas] with standing to enforce the Note and Guaranty. . . . The Omnibus Assignment explicitly referenced the 'Credit Documents' and the attached Schedule 1, which included a

6

list of documents which were expressly assigned to [Texas] and included the Note, Guaranty and Forbearance Agreement. It would defy logic to conclude that the parties did not intend to include the documents identified on Schedule 1 as part of the assignment from Key to Texas . . . .

"Regarding the Forbearance Agreement, it is disingenuous to argue that Defendants may receive the benefit of the Forbearance Agreement when Defendants were clearly in default under the Forbearance Agreement. The Court questions whether Defendants had the ability or intention to comply with the Forbearance Agreement, and there is no evidence that Defendants complied with the Forbearance Agreement. Defendants did not make any payments under the Promissory Note; did not sell the Aircraft; and continued to use the Aircraft. Defendants did not turn over the Aircraft to Key by September 1, 2010 or October 1, 2010. Defendants failed to make the required . . . maintenance payments on the Aircraft.

"The Court finds that [Texas] established that the sale of the Aircraft following [Texas's] repossession of the Aircraft was commercially reasonable. There was no contrary evidence introduced at trial. The credit against the indebtedness applied by [Texas] of $1,153.425.07 after the resale of the Aircraft was appropriate. Damages were established in the amount of $6,065,141.91."

Based on these conclusions, the court awarded Texas $6,065,141.91 against both parties. The court also found defendants did not prove the claims asserted in their cross-complaint.

Defendants appeal.

DISCUSSION

I. *Standing To Enforce Note and Personal Guaranty*

Defendants contend the judgment must be reversed because Texas had no standing to enforce the Note and Personal Guaranty. The argument is without merit. The plain language of the Omnibus Assignment provided Texas with the right to enforce the Note

7

and Personal Guaranty.  Based on this conclusion, we do not reach the issue whether the

Allonge was also valid to transfer these rights.

## A.  *The Omnibus Assignment*

Following an introductory paragraph in which the parties are identified, the

Omnibus Assignment provides:

> "1.  Pursuant to that Promissory Note Aircraft Loan dated as of June 24, 2005 as amended, restated, supplemented or otherwise modified, Assignor made a loan to Blue Pacific Aviation, Inc. ('Borrower') in the principal amount of $4,817,350.28 ('Loan').  *In connection with the Loan, Assignor and Borrower entered into the documents listed on Schedule I hereto (collectively, the 'Credit Documents').*
>
> "2. *Assignor desires to assign, transfer and convey all of its right, title and interest in the Credit Documents and the Loan to Assignee.*
>
> "NOW, THEREFORE, in consideration of the recitals stated above and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, *Assignor agrees as follows*:
>
> "A. *Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in and to the Credit Documents and the Loan.*
>
> "B.  The terms and provisions of this Assignment shall inure to the benefit of, and shall be binding upon, the successors and assigns of the parties hereto."  (Italics added.)

The attached "SCHEDULE 1" identifies six separate loan-related documents:  (1) the

Note; (2) an amendment to the Note; (3) the Security Agreement; (4) *the Personal*

*Guaranty signed by Dr. Smith on June 21, 2005*; (5) the Forbearance Agreement; and (6)

a related UCC Financing Statement.

8

At trial, Daniel Bruce, the transactional attorney who represented Texas in the transfer of Key's credit rights in the Note and Personal Guaranty, testified the purpose of the Omnibus Assignment was to provide for "the overall general assignment of everything relating to [the] Blue Pacific loan," including "the notes, *guaranties*, the security position, everything." (Italics added.) Bruce confirmed the parties intended that the Omnibus Assignment would transfer each of the credit documents listed in Schedule 1. He said that "the Omnibus Assignment absolutely assigned all the interest—all right, title and interest of Key in the credit documents. The credit documents are listed on Schedule 1, being Nos. 1 through 6. The Guaranty is one of those documents. It's at No. 4."

## B. *Analysis*

Under governing New York law, an assignee stands in the shoes of an assignor and a guaranty agreement may be assigned. (See *American States Ins. Co. v. Huff* (2014) 990 N.Y.S.2d 489, 490; *IRB-Brasil Resseguros S.A. v. Eldorado Trading Corp. Ltd.* (2009) 891 N.Y.S.2d 362, 364.) In determining the scope of the assignment, the court's fundamental task is to determine the parties' mutual intention when the contract was formed. (*Greenfield v. Philles Records, Inc.* (2002) 98 N.Y.2d 562, 569.) " 'The best evidence of what parties to a written agreement intend is what they say in their writing. . . .' Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms . . . ." (*Ibid.*)

The language of the Omnibus Assignment reflects the parties' intent to assign Texas rights to the Personal Guaranty. The substantive portion of the Omnibus

9

Assignment—contained after the "NOW, THEREFORE" language—states: "A. Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in and to the *Credit Documents and the Loan*." (Italics added.) The "*Credit Documents*" are defined as those "documents listed on Schedule 1 hereto." Schedule 1 includes "Personal Guaranty Aircraft Promissory Note dated as of June 21, 2005 by Guarantor [Dr. Smith] in favor of Seller [Key]." That document is the Personal Guaranty signed by Dr. Smith at issue here.

Under this plain language, the parties intended to transfer Key's creditor rights in the Personal Guaranty to Texas. The document states the parties intend to transfer all right in the Credit Documents, which include the Personal Guaranty. On its face, the document unambiguously supports that Key assigned to Texas the right to enforce the Personal Guaranty.

Defendants suggest the Omnibus Assignment was ambiguous because in the first paragraph following the introductory clause, the document refers to the loan made between Blue Pacific and Key. This reference does not create an ambiguity. The fact that the borrower/lender relationship was initially identified in the introductory provisions does not reasonably limit the substantive provisions that clearly assign the rights to each of the documents listed in Schedule 1.

Moreover, even if there was an ambiguity, this fact does not help defendants in this case. If contract language is susceptible to two or more reasonable interpretations, the court may admit extrinsic evidence to aid in interpreting the contract. (*Greenfield v. Philles Records, Inc., supra*, 98 N.Y.2d at p. 569.) When there is no material conflict in

10

the extrinsic evidence, the trial court interprets the contract as a matter of law. (*Ibid*.)

The undisputed extrinsic evidence made clear that the parties to the Omnibus Assignment intended that the assignment include the Guaranty Agreement. The Texas attorney who negotiated the agreement testified that the parties specifically intended to include the Personal Guaranty in the assignment and believed the language clearly accomplished this result. Further, as the court noted, a contrary interpretation would be illogical because the undisputed evidence showed that the parties understood at the time that Blue Pacific had no assets except for the airplane and that Texas intended to look to Dr. Smith's assets to collect on the debt. "[A] contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties . . . ." (*Cole v. Macklowe* (2012) 953 N.Y.S.2d 21, 23.)

Defendants alternatively contend the Allonge was ineffective to transfer rights because it was not "firmly affix[ed]" to the Note. Defendants rely on two unreported New York decisions. (See *HSBC Bank USA N.A. v. Roumiantseva* (2013) 975 N.Y.S.2d 709; *U.S. Bank N.A. v. Bresler* (2013) 971 N.Y.S.2d 75.) We need not reach this argument because—as defendants conceded at trial and concede in their appellate brief— if the Omnibus Assignment was valid to assign the Note and Personal Guaranty, it is not necessary to determine the validity of the Allonge. As Texas's transactional attorney explained at trial, Texas executed both the Allonge and the Omnibus Assignment as part of its "belt and suspenders" strategy of employing two alternative methods to assign the rights to ensure the assignment would be recognized. Because we have found the

11

Omnibus Assignment was valid to establish an effective assignment, it is unnecessary to determine whether the Allonge was enforceable under New York law.

II.  *Defendants' Breach Rendered Forbearance Agreement Benefits Inapplicable*

Defendants contend that even assuming Texas had standing to bring this action, it had no right to enforce the Note and Personal Guaranty because Texas did not satisfy the conditions agreed to by Key under the Forbearance Agreement.  Defendants argue that a party seeking to enforce an agreement must show that it complied with the agreement's conditions precedent.  (See *HSBC Mortgage Corp. (USA) v. Gerber* (2012) 955 N.Y.S.2d 131, 132.)

We agree that generally the satisfaction of a contract's conditions is a prerequisite to enforcing the contract.  However, this principle does not benefit defendants in this case.  The undisputed evidence showed defendants were in material breach of numerous provisions of the Forbearance Agreement, including by:  (1) failing to sell the aircraft or turn it over to Key within the agreed-upon time period; (2) continuing to fly the aircraft in defendants' charter business; and (3) failing to comply with the aircraft's Maintenance Service Program.  Under the express terms of the Forbearance Agreement, these breaches triggered the entire balance of the Note to become due and payable, "without presentment, demand, protest or notice of any kind whatsoever, all of which are expressly waived by [Dr. Smith and Blue Pacific]."  Once defendants defaulted on the Forbearance Agreement terms, the "Forbearance Period [was] terminated."  Key (or its assignee Texas) was then entitled to "immediately enforce payment of all obligations and

12

indebtedness . . . under the Loan Documents [defined to include the Note, Security Agreement, and Personal Guaranty] . . . ."

Under these contractual provisions, we reject defendants' claim that Texas was required to provide "an amortization statement" to permit defendants to "commence repayment of the deficiency." The right to an amortization statement was available only if defendants complied with the terms of the Forbearance Agreement. Once defendants defaulted on the Forbearance Agreement, Key (and/or its assignee) was entitled to require defendants to immediately pay the entire balance due on the Note and Personal Guaranty, and defendants no longer had the contractual right to repay the debt over time.

At the conclusion of the trial, the court inquired why defendants would be entitled to obtain the benefits of the Forbearance Agreement "when [they] didn't do anything [to] perform [under this agreement]." Defense counsel was unable to provide a satisfactory response.

On this record, the trial court correctly rejected defendants' claim that Texas was not entitled to enforce the Note and Personal Guaranty because it did not provide defendants with the benefit of the discounted deficiency balance and an amortized repayment schedule. Instead of timely selling or delivering the aircraft to Key, Smith continued to fly it and profit from these charter flights in violation of the Forbearance Agreement. This conduct depreciated the value of the collateral, and deprived the creditor of the benefit bargained for in the Forbearance Agreement: prompt delivery of the collateral in its existing condition, or the proceeds from its sale, without the necessity of repossession and litigation.

13

### III.  *Substantial Evidence Supports Damage Award*

The court found Texas proved damages of $6,065,141.91, reflecting the amount owed by defendants on the Note and Personal Guaranty, after crediting defendants with the net sale proceeds.  Defendants contend this damage amount was unsupported by the evidence presented at trial.  Specifically, they argue that this amount was based on a spreadsheet created by Texas (Exhibit 50), and there was no foundation for this evidence because there was no testimony concerning how the spreadsheet was created, who created it, and "where the information came from . . . ."

Defendants waived this argument by failing to provide an adequate record for this court to consider the issue.  Although defendants designated more than 40 trial exhibits as part of the appellate record, they specifically omitted Exhibit 50 from this designation.  Without the ability to examine Exhibit 50, we cannot rule on defendants' evidentiary challenge.  " 'It is the duty of an appellant to provide an adequate record to the court establishing error.  Failure to provide an adequate record on an issue requires that the issue be resolved against appellant. . . .'  . . .  This principle stems from the well-established rule of appellate review that a judgment or order is presumed correct and the appellant has the burden of demonstrating prejudicial error."  (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348; accord *Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000, 1003.)

Defendants' contention also fails on its merits.  Based on other designated exhibits and trial testimony, we are satisfied the court's finding on the damages amount was supported by substantial evidence.  Defendants expressly admitted in the Forbearance

14

Agreement that they owed $5,089,647.03 as of June 14, 2010. The undisputed evidence further shows that defendants did not make any payments on the Note after that time. The evidence also showed that Texas added interest and late charges to this outstanding balance based on the specified rates provided in the Note, and gave defendants credit for the net proceeds from the sale of the aircraft.

Defendants did not challenge the accuracy of the calculations or present any contrary evidence. During closing arguments, defendants' attorney argued that the Forbearance Agreement was "hearsay" regarding the amount owed. The court properly overruled this objection. Because the Forbearance Agreement was an operative agreement between the parties, it was not hearsay. (See *Kunec v. Brea Redevelopment Agency* (1997) 55 Cal.App.4th 511, 524.) Further, even if the Forbearance Agreement could be considered hearsay, the agreement was signed by Dr. Smith and thus the statement as to the amounts owed was admissible under the exception for admissions of a party opponent. (See Evid. Code, § 1220.)

Defense counsel argued there was insufficient evidence as to damages because Texas did not call any Key witnesses to testify as to the amount owed. The trial court properly rejected the argument, concluding it was entitled to rely on Dr. Smith's admissions in the Forbearance Agreement regarding the outstanding loan balance through June 2010, and then to determine the damages based on this figure, after subtracting the net sales proceeds and adding the permissible interest and late charges.

In their reply brief, defendants suggest there was a "contradiction" between the calculations in Exhibit 50 and a "hearsay loan statement issued by Key." However, there

15

was no evidence that either party produced a "hearsay loan statement issued by Key," or relied on this document to establish damages. Additionally, contrary to defendants' argument, the court did not use Exhibit 50 to establish the amount of the outstanding debt; rather it determined the debt amount based on evidence in the record (including Dr. Smith's own admissions) and determined the applicable interest rate and late charges from the evidence in the record, and then *mathematically calculated* these amounts based on the figures in Exhibit 50.

The court's finding as to the amount of damages was supported by the record.

## DISPOSITION

Judgment affirmed. Appellants to pay respondent's costs on appeal.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McINTYRE, J.

16