[No. A091305. First Dist., Div. Three. Oct. 12, 2000.]

JERRY BROWN, as Mayor, etc., Petitioner, v.
FAIR POLITICAL PRACTICES COMMISSION, Respondent.

## COUNSEL

Jayne W. Williams and John A. Russo, City Attorneys, Joyce M. Hicks, Assistant City Attorney, Daniel J. Rossi, Deputy City Attorney; Law Offices of Lowell Finley and Lowell Finley for Petitioner.

Wayne K. Strumpfer, Kathleen E. Gnekow and Deborah Maddux Alllison for Respondent.

## OPINION

**PARRILLI, J.**—Does the Political Reform Act of 1974 preclude Oakland Mayor Jerry Brown from participating in decisions concerning a redevelopment project near property he owns?[1] The Oakland City Attorney requested

---

[1] The Political Reform Act (PRA) is found in Government Code section 81000 et seq. Further statutory references are to the Government Code.

an opinion on this question from the Fair Political Practices Commission (FPPC). After a public hearing, the FPPC concluded the mayor's participation in the project was not "legally required" within the meaning of the PRA's conflict of interest provisions, and was therefore barred. The mayor filed a petition for a writ of mandate in this court, seeking to compel the FPPC to withdraw its opinion and issue another permitting his participation. We ordered the FPPC to show cause why the relief requested by the mayor should not be granted.[2]

We conclude the mayor's participation in the redevelopment project is legally required in order for the Oakland City Charter to function as the voters intended.

BACKGROUND

1. *The Mayor's Request for an Opinion*

In his request for the FPPC's opinion, dated January 14, 2000, the mayor set out the following circumstances. In November 1998 the voters of Oakland passed initiative Measure X, which amended the city charter. Measure X established the mayor as head of the executive branch of city government. The mayor no longer serves as a member of the city council, but has the power to break tie votes on the council and suspend ordinances for reconsideration in some circumstances. The mayor is authorized to hire, fire, and direct the city manager, who remains the chief administrative officer of the city. Among the duties assigned to the mayor under the charter are to "provid[e] leadership and tak[e] issues to the people and marshal[] public interest in and support for municipal activity," "[e]ncourage programs for the physical, economic, social and cultural development of the City," and "actively promote economic development to broaden and strengthen the commercial and employment base of the City."

The request also informed the FPPC that the mayor serves as chief executive officer of the Redevelopment Agency of the City of Oakland. The agency is a separate legal entity organized under state law, but its governing

---

[2]We ordinarily decline to exercise our original jurisdiction when relief could have been sought in the trial court. However, we have made an exception in this case because (1) the petition raises novel issues of substantial public interest involving municipal government and the PRA; (2) the public interest in proceeding with redevelopment favors minimizing delay in resolving the issues; (3) there are no disputed issues of fact; and (4) the FPPC has not objected to proceeding in this court in the first instance. (See *Legislature v. Eu* (1991) 54 Cal.3d 492, 500 [286 Cal.Rptr. 283, 816 P.2d 1309]; *East Bay Mun. Util. Dist. v. Sindelar* (1971) 16 Cal.App.3d 910, 917 [94 Cal.Rptr. 431]; 8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, § 142, pp. 933-934.)

structure mirrors the city's. The city council is the governing body of the redevelopment agency, and the city manager is the agency's administrator. The mayor does not serve on the agency's governing body, but as chief executive he directs the administrator.

Under the city charter and the bylaws of the redevelopment agency, the mayor has a leadership role in a broad variety of governmental decisionmaking concerning economic development in Oakland. One major redevelopment project presently under consideration is the Lower Broadway/Jack London Square improvement project (the Lower Broadway Project). This project encompasses up to a dozen city blocks between Interstate 880 and the Oakland Estuary, an area including two large existing Alameda County administration buildings and the Oakland Produce Market. A combination of residential, hotel, office, entertainment, retail, and convention center uses is being contemplated, though no definite plans have been made.

The mayor identified a broad range of activities he might undertake in connection with the Lower Broadway Project, including negotiating with the county and the produce market to acquire their properties, helping draft proposals for development, recommending particular developers and a development plan to the city council, directing the city manager and city staff in pursuing development strategies and revising land use and zoning standards, lobbying council members and advocating development strategies before the planning commission, participating in closed session meetings of the council to discuss proposals, and consulting on legal strategies with the council and the city attorney should lawsuits arise over the project.

The mayor owns three contiguous parcels of real property in downtown Oakland, including his primary personal residence and a parcel providing commercial rental income. This property is in the Central District Redevelopment Project Area, but is within 500 to 1,500 feet of the Lower Broadway Project. The mayor conceded that the Lower Broadway Project could have a reasonably foreseeable material effect on his property interests, as defined by FPPC regulations. Although he would not be the final decision maker for the city or the redevelopment agency on most aspects of the project, he would play a significant leadership role in influencing the final decisions. Therefore, the mayor acknowledged he was within the reach of the PRA's conflict of interest provisions.

The mayor noted, however, that under section 87101, an official with a conflict of interest is not barred from joining in an action or decision if his participation is "legally required for the action or decision to be made." The mayor also observed that under section 18708 of the FPPC regulations, an

official is "legally required" to participate when there is "no alternative source of decision consistent with the purposes and terms of the statute authorizing the decision." (Cal. Code Regs., tit. 2, § 18708, subd. (a).)[3] Furthermore, the mayor pointed out that in *Affordable Housing Alliance v. Feinstein* (1986) 179 Cal.App.3d 484 [224 Cal.Rptr. 557] (*Feinstein*), this court held that Mayor Dianne Feinstein could exercise her veto power over a San Francisco rent control ordinance even though she owned rental property in the city. We decided the San Francisco Charter assigned the mayor "a significant and unique function in the city's lawmaking process," ,and to restrict that function "would unquestionably be inconsistent with the terms of the charter and with the separation of powers doctrine underlying its provisions." (*Id.* at p. 491.)

Mayor Brown contended his participation in the Lower Broadway Project is "legally required" by the city charter. He declared: "The Charter assigns to the Mayor a leadership role over economic development of the City. His unfettered participation in economic development matters in Oakland, including downtown redevelopment, would seem to be legally required to fulfill his Charter-mandated duties, notwithstanding any conflict of interest. Under the stated purposes and terms of . . . Oakland's Charter, there is no source of decisionmaking within the executive branch over economic development matters but the Mayor."

## 2. *The FPPC's Opinion*

After a public hearing the FPPC issued a written opinion, concluding "[t]he 'rule of legally required participation' does not apply because Mayor Brown's participation is not required under Oakland's charter for the action or decision to be made, and because an alternative source of decision exists." The FPPC pointed out that the charter broadly authorizes the city manager, as well as the mayor, to administer the affairs of the city, and to recommend policies and legislation to the city council. Section 18708, subdivision (c) of the regulations requires the rule of legally required participation to be narrowly construed.

The FPPC distinguished the *Feinstein* case on the ground that the San Francisco Charter required the mayor to approve or veto each ordinance, whereas Oakland's charter does not require the mayor's participation in the legislative process. In Oakland the city council is fully vested with all powers of legislation, and the city manager is empowered to execute the council's laws and policies and to administer the affairs of the city. Indeed,

---

[3]Further references to regulations are to the FPPC regulations found in title 2, division 6 of the California Code of Regulations.

the charter allows the city manager to perform all the functions identified by the mayor in his request for a decision, and also provides for the vice-mayor to act in the mayor's absence or temporary disability.[4] The FPPC observed that "the goal of actively promoting economic development can be accomplished by a variety of other public, as well as private, activities." While this conclusion removed the mayor from the process of economic development in a large area of downtown Oakland, "this is precisely what the [PRA] intended."

The chairperson of the FPPC concurred separately. She agreed the mayor is barred from participating in legislative decisionmaking, but took the view that he is "legally required" to participate in executive and administrative decisionmaking. The chairperson noted that before the recent charter amendments, the city manager was Oakland's chief executive and the mayor and council were prohibited from interfering in his administration of the city's affairs, though the council could remove him from office. The charter amendments installed the mayor as chief executive. The charter permitted him, and him alone, to direct the city manager, while continuing to prevent the city council from interfering in administrative affairs. If the mayor were removed from his executive role, the city manager would be accountable to no one. Thus, while executive and administrative decisions could still be made by the city manager, that alternative source of decision would not be "consistent with the purposes and terms" of the city charter, under section 18708, subdivision (a) of the regulations. The chairperson added that the vice-mayor, as a member of the city council, was not an acceptable substitute for the mayor with respect to executive decisionmaking.

DISCUSSION

 We begin by reviewing in more detail the relevant legal authorities. The PRA declares: "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest." (§ 87100.)[5] For purposes of this proceeding, the mayor has acknowledged his property interests in Oakland bring him within the scope of this provision. He claims an exemption, however, under section 87101: "Section 87100 does not prevent any public official from making or participating in the making of a governmental decision to the extent his participation is legally required for the action or decision to be made. The fact that an official's vote is needed to break a tie does not make his participation legally required for purposes of this section."

[4]As discussed *post*, the vice-mayor is a city council member elected by the city council.
[5]The parties agree that elected state officers are exempt from the requirements of section 87100, under sections 87102 and 87102.8.

The FPPC has elaborated on the statutory rule of legally required participation in section 18708 of its regulations. Subdivision (a) states: "A public official is not legally required to make or to participate in the making of a governmental decision within the meaning of Government Code section 87101 unless there exists no alternative source of decision consistent with the purposes and terms of the statute authorizing the decision." Subdivision (b) sets forth disclosure requirements and restricts "legally required" participation to official agency meetings. (See *Kunec v. Brea Redevelopment Agency* (1997) 55 Cal.App.4th 511, 521-523 [64 Cal.Rptr.2d 143] [§ 87101 was properly invoked to permit council members to vote, but decision was invalidated by failure to comply with disclosure requirements].) Subdivision (c) states "[t]his regulation shall be construed narrowly," and precludes any interpretation permitting a disqualified official to cast a tiebreaking vote or to vote if a quorum of other agency members can be convened.

In *Feinstein, supra*, 179 Cal.App.3d 484, we noted that section 87101 is a statutory analog of the common law rule of necessity, which permits agency officials or judges to act on matters in which they are personally interested if no other decision maker is available. (179 Cal.App.3d at p. 489.) The plaintiffs in *Feinstein* argued that Mayor Feinstein's participation in passage of a rent control ordinance was not required because the ordinance would have taken effect automatically without her signature. Under the San Francisco Charter, ordinances had to be presented to the mayor for approval or veto, and the mayor's failure to act was deemed an approval. We rejected the notion that the PRA compelled the mayor to approve by inaction every ordinance in which she had a financial interest. The plaintiffs' argument ignored the requirement, then found in section 18701 of the regulations, "that there must be an alternative source of decision 'consistent with the purposes and terms of the statute authorizing the decision.' " (179 Cal.App.3d at p. 490.)

In applying this regulation, we drew a parallel between the San Francisco Charter provisions establishing the roles of the mayor and the board of supervisors, and the provisions of the federal Constitution prescribing the legislative roles of the President and Congress. We noted that both documents made lawmaking a shared power between the executive and legislative branches, and circumscribed the legislative prerogative by giving the executive a limited veto power. The importance of the mayor's role was highlighted by a charter provision that no ordinance would take effect by reason of the mayor's inaction during periods when the mayor was absent and no acting mayor had been designated. We stated: "Clearly under the charter, the mayor has a significant and unique function in the city's lawmaking process. The 'alternative source of decision' which plaintiffs

characterize as a satisfactory substitute would effectively eliminate the mayor's role in that process. To so restrict the mayor's duty and discretion either to approve or veto legislation would unquestionably be inconsistent with the terms of the charter and with the separation of powers doctrine underlying its provisions." (*Feinstein, supra,* 179 Cal.App.3d at p. 491.)

Alternatively, the plaintiffs in *Feinstein* suggested that because the mayor knew she would be away from the city for five days of the 10-day period during which she could act on the ordinance, an acting mayor designated by the mayor from the board of supervisors could have handled the matter. (*Feinstein, supra,* 179 Cal.App.3d at p. 490.) We rejected this claim as well, finding it as inconsistent with the terms and purposes of the charter as the contention that the mayor could simply have taken no action. Nothing in the charter suggested the provisions for designating an acting mayor during the mayor's absence were intended for the delegation of decisionmaking power in the event of a conflict of interest. Nor was there any support for the proposition that the mayor's power to act on legislation depended on her travel plans. Finally, we noted that since the mayor herself selected her temporary replacement, the conflict of interest problem would persist after selection of an acting mayor. (179 Cal.App.3d at pp. 492-493.)

The FPPC distinguishes *Feinstein* in its briefing to this court, as it did in the opinion it furnished to Mayor Brown, on the ground that the Oakland City Charter does not give the mayor a significant or unique role in the legislative process. We disagree with this reading of the charter. The mayor's participation in both proposing and approving legislation is an integral part of the functions assigned to him by the charter, as discussed below. There are, however, significant distinctions between this case and *Feinstein*. Mayor Brown seeks an exemption from the conflict of interest statute for a far broader range of activity than the exercise of veto power at issue in *Feinstein*. And Oakland's charter assigns to the city manager as well as the mayor most of the responsibilities the mayor wants to exercise in connection with the Lower Broadway Project. This factor makes it a closer question than in *Feinstein* whether an "alternative source of decision" bars the mayor from operating under the exemption provided in section 87101. Before resolving these issues, we turn to the relevant charter provisions and their recent history.[6]

First, we note the charter adopts state law governing conflicts of interest. Charter section 1200 states: "No officer of the City may participate on behalf of the City in any transaction or activity in which he has a conflict of interest, as such conflict is defined by State Law." Because the charter thus

---

[6]References to charter sections are to the Charter of the City of Oakland.

aligns itself with the PRA provisions at issue in this case, we reject the mayor's arguments that the act must be construed so as to avoid any conflict with the home rule provisions of the state Constitution, which protect the charter's governance of municipal affairs. There is no conflict between the charter and the PRA.

The charter declares that the city council "shall be the governing body of the City . . . vested with all powers of legislation in municipal affairs adequate to provide a complete system of local government . . . ." (Charter § 207.) There are eight council members, seven elected by districts and one by the voters at large. (Charter § 203.) The mayor is not a member of the council, but can break a tie vote. (Charter § 200.) Ordinances receiving six votes are effective immediately, but all others are effective after seven days. Within three days, the mayor may suspend an ordinance receiving only five votes for reconsideration, in which case six votes are required for the ordinance to take effect. (Charter § 216.) The mayor, the city manager, or any three council members may call special council meetings exclusively for the purpose of considering special subjects. (Charter § 208.) Except for purposes of inquiry, council members are required to deal in administrative affairs only with the mayor, the city manager, or other appointed or elected administrative officers. Council members may not "give orders to any subordinate of the City under the jurisdiction of the City Manager or such other officers, either publicly or privately; nor shall they attempt to coerce or influence the City Manager or such other officers, in respect to any contract, purchase of any supplies or any other administrative action . . . ." (Charter § 218.) Violation of this noninterference provision is a misdemeanor, conviction of which results in immediate forfeiture of office. (*Ibid.*)

The mayor is limited to two 4-year terms. (Charter § 302.) He is the "chief elective officer of the City, responsible for providing leadership and taking issues to the people and marshaling public interest in and support for municipal activity." (Charter § 305.) His enumerated "powers, duties, and responsibilities" include: submitting an annual budget, prepared by the city manager under the mayor's direction, together with a general statement of the city's conditions,· the goals of the administration, and recommended measures to accomplish those goals; generally recommending to the council "such measures and legislation as he deems necessary and . . . mak[ing] such other recommendations to the Council concerning the affairs of the City as he finds desirable"; encouraging development programs, particularly "economic development to broaden and strengthen the commercial and employment base of the City"; appointing the city manager with the council's approval, removing the city manager from office, and giving direction

to the city manager; and representing the city in intergovernmental relations as directed by the council. (*Ibid.*) The vice-mayor, elected for a one-year term by the council from among its members, performs the duties of the office "[i]n the absence or temporary disability of the Mayor." (Charter §§ 208, 306.)

The city manager is the "chief administrative officer of the City." (Charter § 500.) He is appointed for an indefinite term, and serves "at the pleasure of the Mayor." (Charter § 501.) The city manager has "the power and . . . the duty" to perform the following functions which overlap, at least in part, with the mayor's functions: executing and enforcing the city's laws and policies; recommending to the council "such measures and ordinances as he may deem necessary or expedient and . . . mak[ing] such other recommendations to the Council concerning the affairs of the City as he finds desirable"; administering the city's financial affairs, including public contracts; preparing the annual budget for the mayor's submission to the council; representing the city in its intergovernmental relations when directed by the council; and negotiating contracts for joint governmental actions, subject to council approval. (Charter § 504.)

The charter revisions enacted by Measure X in 1998 did not change the powers of the council. The description of the city manager's responsibilities was substantially unchanged, but the mayor was given the new power to direct the city manager's activities. The mayor's enumerated duties were also substantially unchanged, but he gained significant authority over the city's administrative affairs. Before Measure X, the mayor was a council member subject to the noninterference clause (which the initiative did not revise in any substantive way). The principal effect of the charter revisions was to establish the mayor as head of the executive branch of city government, with unprecedented authority to control the city manager's administrative functions. The ballot arguments on Measure X presented the initiative to the voters as a "Strong Mayor" proposal. Proponents contended the city was suffering from lack of accountability in municipal decisionmaking, and confusion between the legislative and executive functions. Opponents argued the measure concentrated too much power in the mayor's office. The measure was approved by approximately 75 percent of Oakland voters.

The FPPC contends the charter gives the mayor "no role in the legislative process," and even "expressly rejects any executive role in the lawmaking process." The charter does not support such a pinched interpretation of the mayor's authority. It specifically empowers the mayor to propose legislation, call special council meetings limited to discussion of his proposals, participate in council votes on ordinances when there is a deadlock, and effectively

veto legislation by calling for reconsideration of ordinances passed by fewer than six votes. The six-vote majority required to pass an ordinance upon reconsideration is three quarters of the votes on the council. These are substantial legislative functions and the mayor is the only elected official in Oakland who can perform them (except for proposing legislation, which any council member may do). Particularly in the area of economic redevelopment, which the charter encourages the mayor to undertake, the ability to propose plans for the council's approval is a crucial first step in a complicated and difficult process, and one for which the mayor is uniquely qualified since he is the official in charge of carrying out the plans.

The FPPC is on firmer ground when it argues that the council is fully capable of proposing and passing legislation on its own, and that the charter authorizes the city manager as well as the mayor to propose legislation. The FPPC recognizes the power to recommend legislation is an important executive responsibility, analogous to the presidential authority conferred by article II, section 3 of the federal Constitution. However, recommending legislation is a discretionary rather than a mandatory exercise of executive authority. Because the mayor's participation in this aspect of the legislative process is not "required for the action or decision to be made," the FPPC claims the exemption of section 87101 cannot apply. Similarly, because the city manager is empowered to perform all the purely executive functions of administering a redevelopment project, the FPPC argues there is an "alternative source of decision" under the charter for implementing the Lower Broadway Project, and the mayor's participation is not legally required.[7]

It is true that if the mayor's participation is prohibited due to a conflict of interest, the terms of the charter permit the Lower Broadway Project to be undertaken by the city council and the city manager. The FPPC takes the position that this is exactly what the PRA requires in the event of a mayoral conflict of interest. However, as we said more than once in *Feinstein, supra,* 179 Cal.App.3d 484, the FPPC's regulations require alternative sources of decision to be "consistent with the purposes and terms of the statute authorizing the decision," which in this case, as in *Feinstein,* is a city charter. (179 Cal.App.3d at pp. 490, 492.) When the charter's purposes are considered, particularly as they are embodied in the terms enacted by Measure X, it is

[7]The FPPC does not renew the suggestion in its opinion that the vice-mayor might also be an "alternative source of decision." It appears that a conflict of interest would not qualify as a mayoral "absence or temporary disability," so as to trigger the vice-mayor's assumption of the duties of the office. (Charter § 306.) Furthermore, the charter does not address whether the vice-mayor would remain a member of the city council if he or she took over for the mayor. If still a council member, the vice-mayor's performance of the duties of the office would be obstructed by the charter's noninterference clause.

clear that eliminating the mayor's role in a major redevelopment project is inconsistent with the system of municipal governance contemplated by the charter. Not only would the mayor be deprived of his authority to propose legislation on a matter of considerable importance, but he would also lose the authority to perform those purely executive functions that Measure X, for the first time, assigned to the mayor's office. Nor, as a practical matter, can the mayor's purely executive functions be neatly separated from his authority in the legislative arena. For example, were the mayor to run into obstacles implementing a redevelopment plan, the ability to propose amendments would be essential for the effective exercise of his executive responsibilities.

As we have already noted, the fact that the charter assigns many of the same functions to both the city manager and the mayor makes this a difficult case, and the FPPC's conclusion an understandable one. Nevertheless, the crucial distinction between the roles of these two officers is that the charter intends the city manager to operate *under the mayor's direction.* The central feature of Measure X, overwhelmingly approved by Oakland voters, was to make the city manager answerable to the mayor, who in turn is answerable to the voters.[8] For purposes of the Lower Broadway Project, the FPPC's opinion would prohibit the mayor from even attempting to act as the chief executive promised by Measure X. City government would effectively resume the power structure that existed under the former charter, which vested the city manager with broad administrative authority and prevented the mayor or the city council from interfering with the city manager's exercise of that authority. Such a result is obviously inconsistent with the charter in its present form, and with the will of the voters. We conclude that the mayor's participation in redevelopment projects, both in their proposal and their implementation, is legally required for city government to function in the manner demanded by the charter.

The mayor is not completely free to ignore the conflict of interest rules. As he acknowledged in his request for the FPPC's opinion, the express terms of section 87101 bar him from exercising his power to break tie votes on the council. And he is bound by the disclosure requirements of section 18708, subdivision (b) of the regulations. (See *Kunec v. Brea Redevelopment Agency, supra,* 55 Cal.App.4th 511, 521-523.) We note, however, that section 18708, subdivision (b)(4) of the regulations, which restricts an officer's "legally required participation" to official open meetings or closed

---

[8]The voters will also have a chance to revisit the changes made by Measure X, under a sunset provision requiring reapproval of the charter amendments in the General Election of November 2004. (Charter § 1213.)

sessions, does not apply to the mayor's functions. He is not required to regularly attend council meetings, and a great many of the activities he would perform in connection with a redevelopment project do not involve formal decisionmaking settings. This regulatory provision is clearly concerned with the role of board, commission, or council members, not with the more active role of a chief executive officer.

We recognize that the FPPC's interpretation of statutes and regulations in the area of its expertise must be given great weight in our analysis. (*Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 484 [71 Cal.Rptr.2d 606].) However, they are not binding on us. Ultimately, questions of statutory and regulatory construction are the responsibility of the courts. The level of deference we accord to an agency's interpretation turns on a legally informed, commonsense assessment of its merits in the context before us. We consider whether the agency has a comparative interpretive advantage over the courts, and also whether its interpretation is likely to be correct. Factors suggesting the agency is correct include indications of careful consideration by senior officials, particularly a collective decision reached after public notice and comment; evidence that the agency has consistently maintained the interpretation; and indications that the interpretation is contemporaneous with the enactment of the statute or regulation being interpreted. (*Yamaha Corp. of America v. State Board of Equalization* (1998) 19 Cal.4th 1, 12-14 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 71, 75 [91 Cal.Rptr.2d 381].)

Although the FPPC has greater experience than the courts in applying conflict of interest rules, we discern no comparative interpretive advantage held by the agency in the context of this case. The application of the rules to an elected chief executive officer's participation in a redevelopment project is a question of first impression. It does not involve obscure technical issues, but instead presents matters of legal interpretation in which courts are well versed and for which they are finally responsible. The FPPC's opinion was rendered by its senior officials after a public hearing, but because it addresses a novel situation it is not a long-standing interpretation. Furthermore, it is apparent both in the opinion issued to the mayor and in the FPPC's arguments to this court that the agency did not apply a critical term of its own regulation. Only the chairperson, in her separate concurrence, acknowledged "the lesson of [*Feinstein, supra,* 179 Cal.App.3d 484] . . . that any alternative source of decision must be, as our own Regulation 18708(a) states, 'consistent with the purposes and terms of the statute authorizing the decision.' " While the FPPC has considered the terms of the

city charter, it has never explained how its conclusion comports with the purposes of the charter regarding the roles of the mayor, the council, and the city manager. This is an essential consideration in applying the conflict of interest principles of sections 87100 and 87101.

 Thus, while we have given substantial weight to the FPPC's opinion in our deliberations, ultimately we disagree with its conclusion. The agency has failed to account for the recent charter amendments' main purpose in establishing the mayor as Oakland's elected chief executive officer. Notwithstanding the narrow construction accorded to the rule of legally required participation, we conclude that the broad scope of the mayor's authority over matters of economic development requires a relatively broad exemption under section 87101. We emphasize that such a sweeping exemption would be inappropriate for officers with more circumscribed roles, or those who are only one of a number of members of an agency, or those who can be replaced by someone who may function in their place consistently with the terms of the governing law. Under Oakland's charter, the mayor's role in redevelopment projects is unique and essential to the balance of power between himself, the council, and the city manager.

Because our holding is limited to this particular set of circumstances, we disagree with the FPPC's claim that applying the rule of legally required participation in this case will "open the floodgates to other exception claims." The FPPC suggests that other cities will come forward with similar claims, and more "strong mayor" charters might emerge. Since this case and *Feinstein* have been the only cases involving "strong mayors" with conflicts of interest since the PRA's enactment in 1974, we are skeptical that any such flood is imminent. Nor do we believe voters are likely to approve "strong mayor" charters merely for the purpose of circumventing the conflict of interest statute. In any event, the merits of charter amendments are solely for the voters to determine. Our duty is to give effect to the provisions enacted by the voters, unless they are inconsistent with controlling law. Here, the rule of legally required participation provided in section 87101 permits the mayor to participate in the Lower Broadway Project by performing the functions contemplated by the Oakland City Charter.

DISPOSITION

Let a peremptory writ of mandate issue commanding the FPPC to withdraw its opinion. The FPPC need not issue another opinion authorizing the

mayor's participation in the Lower Broadway Project; our decision is sufficient for that purpose. The parties shall bear their own costs.

McGuiness, P. J., and Walker, J., concurred.

The petition for review by the Supreme Court on court's own motion was denied December 20, 2000.