931 So.2d 977 (2006)
CITIZENS FOR REFORM, etc., Appellant/Cross-Appellee,
v.
CITIZENS FOR OPEN GOVERNMENT, INC., Appellee/Cross-Appellant,
v.
South Florida AFL-CIO and Transport Workers Union of America, Local 291, AFL-CIO, Intervenors-Appellees.
No. 3D05-2168.
District Court of Appeal of Florida, Third District.
May 31, 2006.
Rehearing and Rehearing Denied June 23, 2006.
*978 Bruce S. Rogow, Fort Lauderdale; Podhurst Orseck and Robert C. Josefsberg and Stephen F. Rosenthal, Miami, for appellant/cross-appellee.
Stephen M. Cody, Coral Gables, for appellee/cross-appellant.
Coffey & Wright and Kendall Coffey; Sale & Kuehne and Benedict P. Kuehne, Miami; Phillips, Richard & Rind and Mark Richard, for intervenors-appellees.
Before WELLS, CORTIÑAS, and ROTHENBERG, JJ.
Rehearing and Rehearing En Banc Denied June 23, 2006.
CORTIÑAS, Judge.
Appellant/Cross-Appellee, Citizens for Reform ("Appellant"), sought to submit to voters a referendum on a proposed amendment *979 to the Miami-Dade County Charter ("Charter"). The proposed ballot language for this amendment provided as follows:
CHARTER AMENDMENT EXPANDING THE MAYOR'S RESPONSIBILITIES AND RESTRICTING THE RESPONSIBILITIES OF THE COUNTY MANAGER
Shall the Miami Dade County Charter be amended to transfer from the County Commission and County Manager to the Mayor certain additional powers and responsibilities including the authority to:
1. Administer County government;
2. Appoint the County Manager unless disapproved by supermajority of the Commission;
3. Appoint department directors unless disapproved by supermajority of the commission; except or otherwise required by law; and
4. Direct, supervise, reprimand or remove the County Manager and department directors.
Appellee/Cross-Appellant, Citizens for Open Government, Inc., filed suit and contended that the proposed amendment violated the requirements of the Florida Constitution and Florida Statutes, that the ballot summary violated the requirements of section 101.161, Florida Statutes (2005), and that the petition in support of the referendum was not properly notarized. South Florida AFL-CIO and the Transport Workers Union of America, Local 291, AFL-CIO were granted permission by the trial court to intervene. Citizens for Open Government, Inc., South Florida AFL-CIO, and the Transport Workers Union of America, Local 291, AFL-CIO are referred to collectively as "Appellees."
The Circuit Court found that the proposed ballot summary met the requirements of section 101.161, and that the petition was properly notarized. Citizens for Open Government, Inc. cross-appeals these rulings by the Circuit Court. We affirm the rulings of the trial court as to the issues on cross-appeal.
With respect to the claim that the proposed amendment violates the requirements of the Florida Constitution and Florida Statutes, the Circuit Court, after holding an evidentiary hearing, found in favor of the Appellees and enjoined the Miami-Dade Elections Department from placing the proposed amendment on the ballot. The Circuit Court found that the proposed amendment removed the Miami-Dade County Commission as the "governing body" and was, therefore, unconstitutional and unauthorized.
We review the trial court's conclusions of law and determination as to the constitutionality of the proposed amendment de novo. See, e.g., Cooper v. Dillon, 403 F.3d 1208, 1213 (11th Cir.2005); One World One Family Now v. City of Miami Beach, 175 F.3d 1282, 1285 n. 4 (11th Cir.1999) (citing Simmons v. Conger, 86 F.3d 1080, 1084 (11th Cir.1996)); State v. O'Daniels, 911 So.2d 247, 251 (Fla. 3d DCA 2005).

The Florida Constitution of 1885 Granted the Voters of Miami-Dade County Broad Home Rule Powers
The Florida Constitution of 1885 provides, with respect to Miami-Dade County, that:
The electors of Dade County, Florida, are granted power to adopt, revise, and amend from time to time a home rule charter of government for Dade County, Florida, under which the Board of County Commissioners of Dade County shall be the governing body.
*980 FL. CONST. art. VIII, § 6(e), n. 3.[1] This section provides that, in the case of Miami-Dade County, the county charter:
[m]ay grant full power and authority to the Board of County Commissioners of Dade County to pass ordinances relating to the affairs, property and government of Dade County and provide suitable penalties for violation thereof; to levy and collect such taxes as may be authorized by general law and no other taxes, and to do everything necessary to carry on a central metropolitan government in Dade County.
Id. The Florida Constitution further provides that the section authorizing a home rule charter of government for Miami-Dade County "shall be liberally construed" to carry out the purpose of home rule for the people of Miami-Dade County in local affairs. Id.
The issue presented on appeal is whether the proposed amendment to the Charter effectively removes the Miami-Dade County Commission as the "governing body." If it does, the proposed amendment is unconstitutional as no provision of the Charter may conflict with the Florida Constitution or general Florida law. See Cook v. City of Jacksonville, 823 So.2d 86 (Fla.2002); Ellis v. Burk, 866 So.2d 1236 (Fla. 5th DCA 2004). If the proposed amendment does not remove the County Commission as the "governing body," the amendment would survive this particular constitutional challenge.
In the absence of specific statutory language, determining what constitutes the "governing body" of the County is a judicial function. As the Florida Supreme Court has held, it is the court's function to interpret the phrase "governing body." Metro-Dade Fire Rescue Serv. Dist. v. Metropolitan Dade County, 616 So.2d 966, 969 (Fla.1993). Since the Charter does not define the term "governing body," this term should be given its usual and obvious meaning. See id.; City of Jacksonville v. Glidden Co., 124 Fla. 690, 169 So. 216, 217 (1936).
There is no dispute that, at the present time, the Miami-Dade Commission serves as the "governing body." To determine whether the proposed amendment removes this authority from the County Commission, we must, therefore, first examine the current structure of government in Miami-Dade County, under which the Commission is its governing body.

The Present Structure of Miami-Dade County Government
Article 1 of the Charter provides for the existence of a Board of County Commissioners and delineates the powers afforded to the Commission. The powers afforded to the Miami-Dade County Commission, include, among others, the power to:
1. Provide and regulate arterial, toll, and other roads, bridges, tunnels, and related facilities; eliminate grade crossings; provide and regulate parking facilities; and develop and enforce master plans for the control of traffic and parking.
2. Provide and operate air, water, rail, and bus terminals, port facilities, and public transportation systems.
...
4. Provide central records, training and communications for fire and police protection; provide traffic control and central crime investigation; provide fire stations, jails, and related facilities; and *981 subject to Section 1.01A(18) provide a uniform system for fire and police protection.
5. Prepare and enforce comprehensive plans for the development of the county.
6. Provide hospitals and uniform health and welfare programs.
7. Provide parks, preserves, playgrounds, recreation areas, libraries, museums, and other recreational and cultural facilities and programs.
8. Establish and administer housing, slum clearance, urban renewal, conservation, flood and beach erosion control, air pollution control, and drainage programs....
9. Provide and regulate or permit municipalities to provide and regulate waste and sewage collection and disposal and water supply and conservation programs.
10. Levy and collect taxes and special assessments, borrow and expend money and issue bonds, revenue certificates, and other obligations of indebtedness in such manner, and subject to such limitations, as may be provided by law.
...
12. Establish, coordinate, and enforce zoning and such business regulations as necessary for the protection of the public.
13. Adopt and enforce uniform building and related technical codes and regulations for both the incorporated and unincorporated areas of the county.
...
15. Use public funds for the purposes of promoting the development of the county, including advertising the area's advantages.
...
17. Enter into contracts with other governmental units within or outside the boundaries of the county for joint performance or performance by one unit in behalf of the other of any authorized function.
18. Set reasonable minimum standards for all governmental units in the county for the performance of any service or function.
...
21. Exercise all powers and privileges granted to municipalities, counties, and county officers by the Constitution and laws of the state, and all powers not prohibited by the Constitution or by this Charter.
22. Adopt such ordinances and resolutions as may be required in the exercise of its powers, and prescribe fines and penalties for violation of ordinances.
23. Perform any other acts consistent with law which are required by this Charter or which are in the common interest of the people of the county.
24. Supersede, nullify, or amend any special law applying to this county, or any general law applying only to this county, or any general law where specifically authorized by the Constitution.
These powers are consistent with the Florida Constitution provision stating that a "governing body of a county operating under a charter may enact county ordinances not inconsistent with general law." FL. CONST. art. VIII, § 1(g) (emphasis added).
Moreover, the delineation of powers afforded to the County Commission is remarkably similar to the powers afforded by statute to the "legislative and governing body" of counties under section 125.01(1), Florida Statutes (2005) (emphasis *982 added). Under section 125.01(1), the "legislative and governing body" of a county is afforded, although not restricted, the power to:
(e) Provide hospitals, ambulance service, and health and welfare programs.
(f) Provide parks, preserves, playgrounds, recreation areas, libraries, museums, historical commissions, and other recreation and cultural facilities and programs.
(g) Prepare and enforce comprehensive plans for the development of the county.
(h) Establish, coordinate, and enforce zoning and such business regulations as are necessary for the protection of the public.
(i) Adopt, by reference or in full, and enforce housing and related technical codes and regulations.
...
(k) 1. Provide and regulate waste and sewage collection and disposal, water and alternative water supplies, including, but not limited to, reclaimed water and water from aquifer storage and recovery and desalination systems, and conservation programs.
...
(l) Provide and operate air, water, rail, and bus terminals; port facilities; and public transportation systems.
(m) Provide and regulate arterial, toll, and other roads, bridges, tunnels, and related facilities; eliminate grade crossings; regulate the placement of signs, lights, and other structures within the right-of-way limits of the county road system; provide and regulate parking facilities; and develop and enforce plans for the control of traffic and parking.
...
(p) Enter into agreements with other governmental agencies within or outside the boundaries of the county for joint performance, or performance by one unit in behalf of the other, of any of either agency's authorized functions.
...
(r) Levy and collect taxes, both for county purposes and for the providing of municipal services within any municipal service taxing unit, and special assessments; borrow and expend money; and issue bonds, revenue certificates, and other obligations of indebtedness, which power shall be exercised in such manner, and subject to such limitations, as may be provided by general law.
...
(s) Make investigations of county affairs; inquire into accounts, records, and transactions of any county department, office, or officer; and, for these purposes, require reports from any county officer or employee and the production of official records.
§ 125.01(1), Fla. Stat. (2005).
In addition to the powers afforded under Article 1 of the Charter, the Commission has the power "to create a Planning Advisory Board, a Zoning Appeals Board, and such other boards as it may deem necessary." The Commission is also empowered to appoint the County Attorney as well as the Commission Auditor.
Article 2 of the Charter provides for the Office of the Mayor and establishes the responsibilities of the Mayor. At present, the Charter states the "Mayor shall serve as head of the county government" with the following responsibilities:
A. The Mayor shall within ten days of final adoption by the Commission, *983 have veto authority over any legislative, quasi judicial, zoning, master plan or land use decision of the Commission, including the budget or any particular component contained therein which was approved by the Commission; provided, however, that (1) if any revenue item is vetoed, an expenditure item in the same or greater dollar amount must also be vetoed and (2) the Mayor may not veto the selection of the chairperson or vice chairperson of the commission, the enactment of commission committee rules, the formation of commission committees, or the appointment of members to commission committees. The Commission may at its next regularly scheduled meeting after the veto occurs, override that veto by a two-thirds vote of the Commission present.
B. When one person succeeds another in the position of Mayor, the successor shall have the right to appoint the Manager, subject to the approval within 14 days of a majority of the Commissioners then in office. The Mayor shall appoint the Manager, subject to the approval within 14 days of a majority of the Commissioners then in office. The Mayor may remove the Manager subject to the Commission's conducting a hearing within 10 days of said removal and the Commission's overriding the Mayor's action by a two-thirds vote of those Commissioners then in office. Additionally, the Commission by a two-thirds vote of those Commissioners then in office shall be able to remove the Manager.
Article 3 of the Charter presently provides for the existence of a County Manager as the "head of the administrative branch of the county government." Section 3.04 outlines the powers and duties of the County Manager and states:
A. Commencing with the election of Mayor in 1996, the Manager shall be responsible for the administration of all units of the county government under the Manager's jurisdiction, and for carrying out policies adopted by the Commission. The Manager, or such other person as may be designated by resolution of the Commission, shall execute contracts and other instruments, sign bonds and other evidences of indebtedness, and accept process.
B. Unless otherwise provided for by civil service rules and regulations, the Manager shall have the power to appoint and suspend all administrative department heads of the major departments of the county, to wit: Tax Collector, Tax Assessor, Department of Public Works, Department of Public Safety, Building and Zoning Department, Planning Department, Finance Department, Park and Recreation Department and Internal Auditing Department, except that before any appointment shall become effective, the said appointment must be approved by the County Commission and if same is disapproved the said appointment shall be void. In the event such appointment shall be disapproved by the County Commission the appointment shall forthwith become null and void and thereupon the County Manager shall make a new appointment or appointments, each of which shall likewise be submitted for approval by the County Commission. However, the right to suspend, remove or discharge any department head with or without cause, is reserved at all times to the County Manager.
Section 3.05 of the Charter also contains the following restrictions on the Mayor and the County Commission:

*984 SECTION 3.05. RESTRICTIONS ON THE MAYOR AND COMMISSION MEMBERS.
A. Neither the Mayor nor any Commissioner shall direct or request the appointment of any person to, or his or her removal from, office by the Manager or any of the Manager's subordinates, or take part in the appointment or removal of officers and employees in the administrative services of the county, nor shall the Manager or any member of the administrative services accede to such direction or request. Any willful violation of this section by the Mayor or Manager or any County employee shall be grounds for his or her removal.
B. Except for the purpose of transmitting constituent inquiries to the administrative services and other inquiry, as provided in Section 1.01A(20), the Mayor and Commissioners shall deal with the administrative service solely through the County Manager's Office and neither the Mayor nor any Commissioner shall give orders to any subordinates of the Manager, either publicly or privately.
No County employee, other than the County Manager, shall respond to or undertake any action to comply with any request by the Mayor or any Commissioner which violates the provisions of the preceding paragraph. The County Manager shall not knowingly allow any Commissioner to deal with the administrative services in violation of the provisions of the preceding paragraph.

The Proposed Amendment and its Effects on the Structure of Miami-Dade County Government
Next, we consider the proposed amendment to the Charter and its effects on the powers of the County Commission, Mayor, and County Manager.
With respect to the County Commission, the proposed amendment would alter Article 1 of the Charter as follows (proposed deletions are struck through and proposed additions are underlined):
A. The Board of County Commissioners shall be the legislative and the governing body of the county. The Board of County Commissioners and shall also have certain additional powers including the power to carry on a central metropolitan government. This power shall include but shall not be restricted to the power to:
(1) ....
...
(24) ....
Under the proposed amendment, the powers specifically granted under this section are verbatim the powers currently provided and exercised by the Board of County Commissioners.
The following three paragraphs, which the proposed amendment seeks to include in Article 1, are the same restrictions which are currently in effect upon the Commission, but are presently contained in Section 3.05. Thus, the following restrictions have simply been moved to Article 1.
C. No Commissioner shall direct or request the appointment of any person to, or his or her removal from office, by the Manager or any of the Manager's subordinates, or take part in the appointment or removal of officers and employees in the administrative services of the county, nor shall the Manager or any member of the administrative services accede to such direction or request.
D. Except for the purpose of transmitting constituent inquiries to the administrative services and other inquiry, as provided in Section 1.01A(20), the *985 Commissioners shall deal with the administrative service solely through the County Manager's Office and no Commissioner shall give orders to any subordinates of the Manager, either publicly or privately.
No County employee, other than the County Manager, shall respond to or undertake any action to comply with any request by any Commissioner which violates the provisions of the preceding paragraph. The County Manager shall not knowingly allow any Commissioner to deal with the administrative services in violation of the provisions of the preceding paragraph.
With respect to Article 2, which involves the powers of the Mayor, the proposed amendment would transfer powers and responsibilities that are currently in the hands of the County Manager to the Mayor. For example, the proposed amendment would give the Mayor the following additional rights, powers, and duties, among others:
(2) To recommend to the Commission such resolutions, ordinances or other actions as he or she may deem necessary or expedient, and to make such other recommendations to the Commission concerning the affairs of the County as the Mayor finds desirable;
...
(4) Sole authority to appoint the County Manager, unless disapproved by a 2/3 majority of the full Commission at their next regularly scheduled meeting;
(5) Sole authority to direct and exercise control over the County Manager in managing those affairs of the County under the purview of the Mayor;
(6) Sole authority to dismiss the County Manager;
(7) Sole authority to appoint County representatives to boards, commissions, committees and governmental agencies, unless controlling law vests the power of appointment with the Governor, the County Commission or a County Official other than the Mayor.
...
(9) Unless otherwise provided for by the Charter or by civil service rules and regulations, the Mayor shall have the power to appoint all administrative department directors of the department of the county.
Also, under section 2.02 of the proposed amendment, the Mayor, and not the County Manager, "shall be responsible for the administration of all departments of the county government and for carrying out policies adopted by the Commission." The proposed amendment would give the Mayor authority to appoint administrative department directors and representatives to various county boards and committees. As will be discussed below, these additional powers granted to the Mayor are, for the most part, administrative powers, which are currently afforded to the County Manager.
With respect to the powers of the County Manager, which are currently in Article 3, the proposed amendment greatly reduces his/her powers. The proposed amendment would eliminate and transfer the County Manager's powers to the Mayor. The County Manager would then serve "under the direction of the Mayor." Moreover, under the proposed amendment, the Mayor and not the Commission would have the sole authority to dismiss the County Manager. However, the Commission would retain the power to disapprove of the Mayor's selection for County Manager as well as administrative department directors by a two-thirds majority of the Commission.
*986 In considering these proposed changes to the Charter, the Circuit Court focused on the deletion of certain critical words, such as "governing" and "power to carry on a central metropolitan government." During the hearing in this case, the Circuit Court stated:
All parties agree that a charter amendment that removes the County Commission as the governing body is unconstitutional and unauthorized. Yet the charter amendment does just that, by its very language, limiting the Board of County Commissioners to the status of a "legislative body," and taking away the "governing body" authority. That repeal is explicit and central to the amendment, and cannot be ignored by this Court.
Similarly, we cannot overlook the obvious significance of deleting the words "governing body" from the reference to the County Commission in Article 1 of the Charter. We agree that the deleted words are important but recognize that the proposed deletions are not dispositive. Specifically, in the case of Miami-Dade County, the Florida Constitution expressly requires the County Commission to be the governing body and not merely to be named as such. See FL. CONST. art. VIII, § 6(e), n. 3. Therefore, the particular choice of nomenclature does not and cannot end our inquiry. Instead, our analysis and holding turns on the effect of the proposed amendment. If the proposed amendment has the effect of removing the Miami-Dade County Commission as the "governing body," it must be found to be unconstitutional as no provision of the Charter may conflict with the Florida Constitution or general Florida law. See Cook, 823 So.2d 86; Ellis, 866 So.2d 1236. Conversely, if the effect of the proposed amendment is not to remove the County Commission as the "governing body," the amendment would survive.
Much more striking than the deleted words "governing body" is the unassailable fact that not one single power of the County Commission, as provided in Article 1 of the Charter, is altered in any way by the proposed amendment. Under the proposed amendment, the County Commission retains all of the powers afforded to it under Article 1.
It is important to observe that a county's governing powers emanate from the Florida Constitution and Florida Statutes. In the case of Miami-Dade County, these governing powers primarily arise from two sources.
The first source of Miami-Dade's local government powers is Section 11 of Article VIII of the Florida Constitution of 1885, which authorizes a home rule charter and government for the people of Miami-Dade County. As noted above, the Constitution grants Miami-Dade County broad home rule powers. FL. CONST. art. VIII, § 6(e), n. 3.
The second source of Miami-Dade's governing powers is section 125.01(1), Florida Statutes (2005). Section 125.01(1) provides, in pertinent part:
The legislative and governing body of a county shall have the power to carry on county government. To the extent not inconsistent with general or special law, this power includes, but is not restricted to, the power to:
(a) ....
...
(dd) ....
Section 125.01(1), Florida Statutes (2005) (emphasis added). Section 125.01(1) grants to the "legislative and governing body" of the county "the power to carry on county government," which includes, but is *987 not limited to, a broad range of powers listed in sections 125.01(1)(a)-(dd). Id.
This broad grant of power means that, unless the Legislature has pre-empted a particular subject relating to county government, the "legislative and governing body" is afforded full authority to act through the exercise of its home rule power. See Speer v. Olson, 367 So.2d 207, 211 (Fla.1979). One of the purposes of Chapter 125 was to "enable local governments to govern themselves without the necessity of running to the legislature every year for authority to act." Home Builders & Contractors Ass'n of Palm Beach County, Inc. v. Board of County Comm'rs, 446 So.2d 140, 143 (Fla. 4th DCA 1983) (citing Speer, supra; State v. Orange County, 281 So.2d 310 (Fla.1973)).
Important for our consideration is the Legislature's use of the word "and" rather than "or" in section 125.01(1). Section 125.01(1) essentially grants to the "legislative and governing body of the county" the power to "carry on county government," through the use of the enumerated powers in sections 125.01(1)(a)-(dd). The Legislature's use of the word "and" assists us greatly in determining what entity is the "legislative and governing body" of a county. A plain reading of this section suggests that the enumerated powers in sections 125.01(1)(a)-(dd) cannot be exercised by either the legislative or the governing body of a county but, rather, can only be employed by the entity that is both the "legislative and governing body."
Under section 125.01(1), the "legislative and governing body" has the power to: (a) provide for roads, bridges and tunnels; (b) provide for air, water, rail, and bus terminals and public transportation systems; (c) provide hospitals; (d) provide parks, libraries, and museums; (e) provide and regulate waste and sewage collection and disposal; (f) levy and collect taxes; (g) establish, merge, and abolish special purpose taxing districts; (h) establish and enforce zoning regulations; (i) adopt uniform building codes and regulations; (j) regulate and grant franchises to operate utilities; and (k) approve or disapprove contracts or the issuance of bonds, among other powers. Thus, whoever has these powers is, in essence, the "legislative and governing body" of Miami-Dade County.
At the present time, there is no dispute that the County Commission possesses the bulk of the powers identified in section 125.01, which are contained in Article 1 of the Charter, and, as such, is the "legislative and governing body" of Miami-Dade County. Likewise, under the proposed amendment, the County Commission would retain all of the powers afforded to it under Article 1 of the Charter and section 125.01 and, thus, would continue to be the "legislative and governing body."
Mahavira, a 9th century Indian mathematician, understood and explained arithmetic operations involving zero, such that any number plus or minus zero equals that number, and any number minus itself equals zero. Thus, if we assume that the reservoir of powers currently afforded to the County Commission under Article 1 of the Charter, including the full panoply of quasi-judicial powers, enable the County Commission to be the "legislative and governing body" of Miami-Dade County, then subtracting zero from these powers changes little, at least with respect to identifying the "legislative and governing body."
That is not to say that the proposed amendment would have no effect on the structure of County government. Indeed, the proposed changes to the Miami-Dade Charter would transfer to the Mayor a great deal of control over the administration of County government. Appellees suggest that subsumed within the issue of *988 whether or not the proposed amendment effectively removes the Miami-Dade County Commission as the "governing body" lies the question: Who controls the administration of county government? It is suggested that the answer to this latter question ultimately decides the issue before us. Thus, Appellees argue that the proposed amendment takes control over the administration of county government away from the County Commission and, as a result, removes the Commission as the "governing body."
However, such administrative powers have never rested with the County Commission and, in any event, are not the source of the Commission's governing authority. Instead, the proposed amendment primarily alters the administrative powers of the Mayor and those of the County Manager.
These powers of administration, which are currently held by the County Manager, are not "governing body" powers. Otherwise, the County Manager and not the County Commission would be the "governing body." Under the present Charter, the County Manager is not a member of the Commission but is responsible for "carrying out policies adopted by the Commission." Similarly, under the proposed amendment, the Mayor would not be a member of the Commission but would be responsible for "carrying out policies adopted by the Commission." Although undoubtedly important, the powers of administration serve to carry out and implement the decisions of the "governing body." Therefore, almost by definition, the proposed transfer of administrative duties from the County Manager to the Mayor would not alter the status of the Commission as the County's "governing body."
Nor would diminished oversight powers of the Commission over administrative responsibilities radically alter the Commission's powers, such that it would no longer be the "governing body." Under both the Charter and the proposed amendment, administrative powers exist to carry out the policies adopted by the Commission. Thus, it is clear that the powers of administration must conform to the dictates and policies of the County Commission and not vice-versa.
It is suggested by Appellees that the elimination of the County Commission's power to remove the County Manager results in a change in the Commission's status as "governing body" and, as a result, renders the proposed amendment unconstitutional. This contention is utterly flawed.
First, this argument ignores the fact that, under the current Charter, the powers to appoint as well as dismiss the County Manager rest primarily with the Mayor and not the Commission. The Charter provides that the Mayor "shall appoint the Manager," subject only to the Commission approving or disapproving the Mayor's choice for County Manager. The Charter also currently provides that "[t]he Mayor may remove the Manager," which can only be overridden by a two-thirds vote of the Commission after conducting a hearing within ten days of said removal.
Second, Appellees' position fails to take into account the County Commission's current limited power to independently remove the County Manager. At the present time, the County Commission only holds a supermajority power to dismiss the County's top administrator, exercisable only upon a vote of two-thirds of the commissioners in office. While we do not wish to minimize the effect of this reduction in the Commission's powers, it is not, by itself, so significant as to constitute a *989 change in the "governing body" of Miami-Dade County.
Third, Appellees' argument ignores the fact that the proposed amendment, in effect, would give the voters of Miami-Dade County a majority power, exercisable through election, over the County's top administrator, who would be the Mayor under the proposal. Thus, under the proposed amendment, although the Commission would lose its limited supermajority power to remove the County's head administrator (currently, the County Manager), the voters would gain a majority power to remove the proposed head of administration (the Executive Mayor). Thus, under the proposed amendment, the Commission's limited removal power over the top administrator is not transferred from the Commission to the Mayor but, rather, from the Commission to the people. In doing so, Appellants contend that such a change comports entirely with the introductory words of the Charter, which provide: "This government has been created to protect the governed, not the governing." Miami-Dade County Home Rule Charter, Citizens' Bill of Rights (A).
The elimination of an extremely limited supermajority power to dismiss the County Manager, a position over which the Mayor is currently afforded much broader powers to select and dismiss, does not and cannot constitute a change in "governing body." This is so especially in light of the fact that the Commission's broad Article 1 Charter powers remain virtually unchanged as a result of the proposed amendment.
Appellees' constitutional challenge is premised upon a flawed comparison between the proposed "Executive Mayor" and the Executive branches of the federal and state governments. Appellees contend that the proposed amendment would effectively equip the Mayor with Executive branch-type powers and, thereby, remove the County Commission as the governing body. However, when analyzed closely, that would not be the case. As we have noted earlier, the proposed Executive Mayor would only be acquiring administrative powers that currently reside with the County Manager. These powers pale in comparison to powers exercised by the Executive branches of federal and state governments. See, e.g., FL. CONST. art. IV, §§ 1 and 4. Such a Mayor would not be akin to an Executive branch of government.
Our conclusion is supported by cases from other jurisdictions holding that the concept of Constitutional separation of powers simply does not exist at the local government level. See e.g., State, ex rel. Wilkinson v. Lane, 181 Ala. 646, 62 So. 31, 34 (1913) (finding that the doctrine of separation of powers has "no applicability, and [was] never intended to apply, to mere town or city governments or to mere town or city officials"); Ghent v. Zoning Comm'n, 220 Conn. 584, 600 A.2d 1010, 1012 (1991) ("The constitutional [separation of powers] provision applies to the state and not to municipalities, which are governed by charters and other statutes enacted by the legislature."); Poynter v. Walling, 177 A.2d 641, 645 (Del.Super.Ct.1962) (finding that the "constitutional requirement of separation of the three governmental departments applies to state government and not to the government of municipal corporations and their officers"); Tendler v. Thompson, 256 Ga. 633, 352 S.E.2d 388, 388 (1987) (concluding that the "doctrine of separation of powers applies only to the state and not to municipalities or to county governments"); Willsey v. Newlon, 161 Ind.App. 332, 316 N.E.2d 390, 391 (1974) (noting that "it has repeatedly been held that the separation of powers doctrine of Article III has no application at *990 the local level"); Bryan v. Voss, 143 Ky. 422, 136 S.W. 884, 887 (1911)(noting that "it has not been the policy of the state to separate legislative from executive functions in its government of the municipalities"); Wilson v. City of New Orleans, 466 So.2d 726, 729 (La.Ct.App.1985) (finding that the doctrine of separation of powers "applies only to the state and is not applicable to local governments"); County Council for Montgomery County v. Investors Funding Corp., 270 Md. 403, 312 A.2d 225, 243 (1973) ("The constitutional doctrine of separation of powers is ... not applicable to local government."); State ex rel. Simpson v. City of Mankato, 117 Minn. 458, 136 N.W. 264, 267 (1912) (finding that the separation of powers "does not apply to municipal governments"); Ball v. Fitzpatrick, 602 So.2d 873, 878 (Miss.1992) (explaining that the "system of checks and balances is not needed at the local level"); Graziano v. Mayor and Township Comm., 162 N.J.Super. 552, 394 A.2d 103, 108 (1978)(finding that "the separation of powers doctrine as it applies to federal and state governments is inapplicable to municipalities"); Bd. of County Comm'rs v. Padilla, 111 N.M. 278, 804 P.2d 1097, 1102 (1990) ("Traditional [separation of powers] doctrine derives from concern about the tyranny that can arise when one branch of government  the executive, legislative, or judicial  assumes the powers of another. (citation omitted). Apparently, because this danger is diminished for a level of government whose powers are subordinated to higher levels of government or otherwise limited, the New Mexico Constitution's provision on separation of powers... does not apply to the distribution of power within local governments."); LaGuardia v. Smith, 288 N.Y. 1, 41 N.E.2d 153, 156 (1942) (finding that the "theory of co-ordinate, independent branches of government has been held generally to apply to the national system and to the states, but not to the government of cities").
Decisions from other jurisdictions also support our conclusion that a "strong mayor" may co-exist with a county commission as "governing body." The two are not mutually exclusive. See Dickinson v. City of Huntsville, 822 So.2d 411 (Ala. 2001); Smitherman v. Marshall County Comm'n, 746 So.2d 1001 (Ala.1999); Stomel v. City of Camden, 383 N.J.Super. 615, 893 A.2d 32 (2006); Brown v. Fair Political Practices Comm'n, 84 Cal.App.4th 137, 100 Cal.Rptr.2d 606 (2000).
As we have earlier observed, the powers to create or eliminate roads, transportation terminals, hospitals, housing, parks, libraries, and museums, as well as the powers to levy taxes, and promulgate ordinances, and establish zoning regulations, among others, are currently vested in the County Commission. Under section 125.01(1), these are the broad powers of the "legislative and governing body," which are necessary to "to carry on county government." Section 125.01(1), Florida Statutes (2005). The proposed amendment does not reduce or remove any of the powers afforded to the Commission under section 125.01(1) or Article 1 of the Charter. Nor does the proposed amendment alter the Commission's quasi-judicial powers over zoning regulations. Thus, in this case, the proposed "Executive" Mayor does not remove the County Commission as the "governing body" of the County. Both may and would co-exist under the proposed amendment.
Whether the proposed amendment is ultimately advisable is not for the courts to determine. Our role is strictly limited to filtering proposals for legal and constitutional deficiencies. With respect to the proposed amendment, we find none. There being no constitutional or statutory impediment to its presentation on the ballot, *991 the proposed amendment is left for consideration by the voters.
Affirmed in part; reversed in part; and remanded.
NOTES
[1] This section, which was originally Section 11 of Article VIII of the Florida Constitution of 1885, as amended, was expressly retained and made part of the existing Florida Constitution. See FL. CONST. art. VIII, § 6(a) and (e), n. 3.